**FRIENDSHIP MEDICAL CENTER, LTD. and T.R.M. Howard, Plaintiffs-Appellants,**

v.

**The CHICAGO BOARD OF HEALTH et al., Defendants-Appellees.**

**No. 74-1070.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1974.

Decided Oct. 30, 1974.

Certiorari Denied March 24, 1975. See 95 S.Ct. 1438.

---

Julian B. Wilkins and Robert L. Graham, Chicago, Ill., for plaintiffs-appellants.

Richard L. Curry, Corp. Counsel and Ann Acker, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, and FAIRCHILD and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The question presented is whether the Chicago Board of Health may promulgate and enforce regulations which describe in substantial detail conditions, equipment, and procedures that medical facilities offering abortions must comply with, without regard to the trimester of pregnancy involved.

## I

Friendship Medical Center, Ltd. is a medical corporation organized pursuant to the laws of Illinois, which owns and operates a medical facility that offers abortions to pregnant women. Plaintiff Howard is the president of Friendship, a member of its board of directors, a shareholder, as well as a physician who practices through the facilities which Friendship operates. The defendants are the Chicago Board of Health and the members of that Board.

Plaintiffs brought this suit for alleged violations of 42 U.S.C. § 1983 [1] seeking an injunction against enforcement, and a declaration that the regulations promulgated by the defendant are unconstitutional. Plaintiffs-appellants appeal from the decision of the district court denying them standing to assert as one of the grounds for invalidating the regulations a woman's fundamental right of privacy, and the order granting the defendant's motion to dismiss for failure to state a claim upon which relief could be granted. Friendship Medical Center, Ltd. v. Chicago Board of Health, 367 F. Supp. 594, 607 (N.D.Ill.1973).[2]

The plaintiffs urge on this appeal that: (a) they have standing to challenge the abortion regulations on the grounds that the regulations unconstitutionally restrict their patient's rights to personal and marital privacy; (b) the abortion regulations are an invalid and overbroad enactment infringing unreasonably upon fundamental rights because of their failure to exclude the first trimester; and (c) they are invalid because of their stringent and sweeping requirements which are not legitimately related to recognized governmental objectives to protect maternal health.[3]

The defendants contend that not only do the plaintiffs lack standing, but also that the Supreme Court's recent abortion decisions do not proscribe attempts by state or local governments to impose safety regulations that are reasonably related to their interest in protecting the health of those seeking abortions.

On January 22, 1973 the United States Supreme Court rendered its landmark decisions on abortion. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Shortly thereafter in May of 1973 the defendants adopted Regulations for Abortion Services for the City of Chicago.[4]

---

1. 42 U.S.C. § 1983 reads as follows:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. The district court determined that it had jurisdiction over the cause pursuant to 28 U.S.C. § 1331, 367 F.Supp. 598–599, and the defendants have not pressed this point on appeal. The district court also rejected the defendants' contention that the case was moot because the plaintiff had in fact complied with the challenged regulations. The court found that the regulations had "a continuing regulatory effect on the plaintiffs" and thus rejected the mootness claim. 367 F.Supp. at 601. As with the jurisdictional claim, the defendants have abandoned this argument on appeal.

3. Because of our disposition of the case, we have found it unnecessary to consider appellants' arguments that the abortion regulations deny procedural due process and are unduly vague.

4. The regulations have been set out as an appendix to the district court's opinion. Friendship Medical Center, Ltd. v. Chicago Board of Health, 367 F.Supp. 594, 608–621 (N.D.Ill.1973).

The regulations require that an abortion be performed by a licensed physician and in a facility that complies with its provisions. Each facility is required to keep records in regard to the admission and discharge of patients, medical histories, results of tests, social services offered and other patient progress notes. Chicago Board of Health Regulations on Abortion Services, section IV(a), [hereinafter cited as Abortion Regulations]. It must also prepare monthly reports which are to include the number of patients that requested, and were either given or denied abortions, and the name and address of patients who developed complications following the abortion and a description of such complications. Abortion Regulations, *supra,* section IV(b).

All equipment and supplies must be maintained in proper working order, and necessary solutions, drugs and medications must be available. There must be a knee or foot controlled sink immediately adjacent to the room where the abortion is performed, an elevator that can accommodate a stretcher if any abortion service is located above ground level, anesthesia and such other equipment as is necessary to treat for hemorrhage, shock, cardiac arrest, and other emergencies. Abortion Regulations, *supra,* sections VI, VIII, IX(c). Each abortion service is required to have facilities for registration, medical evaluation and examination, post-operative recovery and suitable furnishings and accommodations, including waiting and dressing rooms. Abortion Regulations, *supra,* sections IX, XII.

In addition every non-hospital abortion service must have a written affiliation agreement with a licensed Chicago hospital allowing the use of its laboratory facilities and providing for the treatment of its patients requiring emergency care. The abortion service must have immediately available organized transportation facilities capable of transporting patients to the affiliated hospital within fifteen minutes. Abortion Regulations, *supra,* sections I(d), VII, X. The regulations also require that an abortion service be supervised by a physician who is either a qualified obstetrician or surgeon;[5] that there be at least one registered professional nurse with post graduate experience in obstetric or gynecological nursing on duty at all times while the abortion service is in use and that there be a social service

---

5. The terms qualified obstetrician and qualified surgeon are defined as follows:
Qualified Obstetrician means:
(1) A licensed physician who is a diplomate of the American Board of Obstetrics and Gynecology; or who submits evidence to the Chicago Board of Health that his training and experience qualify him for admission to the examination by such Board; or
(2) A licensed physician who is a Fellow of the American College of Surgeons in the specialty of Obstetrics and Gynecology; or The American College of Obstetrics and Gynecology.
(3) A Doctor of Osteopathy who holds a license to practice medicine in the State of Illinois and who is certified by the American College of Osteopathic Obstetricians and Gynecologists, or who submits evidence to the Chicago Board of Health that his training and experience qualify him for admission to the examination by such Board, or who submits evidence of completion of an approved residency in obstetrics and gynecology.
Qualified Surgeon means:
(1) A licensed physician who is a Diplomate of the American Board of Surgery, or who submits evidence to the Chicago Board of Health that his training and experience qualify him for admission to the examination by such Board; or
(2) A licensed physician who is a Fellow of the American College of Surgeons; a Doctor of Osteopathy who holds a license to practice Surgery in the State of Illinois and who is certified by the American College of Osteopathic Surgeons, or who submits evidence to the Chicago Board of Health that his training and experience qualify him for admission to the examination by such Board or who submits evidence of completion of an approved residency in surgery.
Abortion Regulations, *supra,* sections I(f), (g).

unit available to the patients of the service. Abortion Regulations, *supra,* sections XIII(b), XIV(b), XV.

Finally, the Chicago Board of Health requires that a complete medical history be obtained including not only a pelvic examination, but also the following laboratory tests on every patient: hematocrit, Rh factor, complete urinalysis and blood grouping. Abortion Regulations, *supra,* section XVI(c). There is also required to be an interval of at least twenty-four hours between the initial examination and the termination of the pregnancy to permit review of all laboratory tests "and to permit and encourage thorough consideration and a firm decision by the patient regarding termination of pregnancy." Abortion Regulations, *supra,* section XVI(e).

The regulations themselves provide for the closing of any abortion service that either fails to register or which, if it continued in operation would be in violation of any of the Board of Health's regulations. Abortion Regulations, *supra,* section XIX. In addition certain of the named defendants, as well as other employees of the defendant Board have been given "full police powers" as well as the "right to arrest" any individual that does not comply with the provisions of the health code.[6] Municipal Code of Chicago, ch. 9, § 5.

## II

The district court while allowing the plaintiffs to challenge the Abortion Reg-

ulations on substantive and procedural due process and equal protection grounds, refused to allow them to attack the regulations as violative of a woman's right of privacy as delineated in *Roe* and *Doe. Friendship Medical Center, supra* at 600. In our view the district court viewed plaintiffs' right to challenge the Board of Health's regulations too narrowly.

The initial inquiry in determining if the plaintiffs have the requisite standing to maintain this action is whether they have alleged such a personal stake in the outcome of the controversy so as to assure that there exists "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In the present case it is clear that both the individual and corporate plaintiff have a sufficient interest at stake to allow them to proceed with this action. Both plaintiffs allege that the regulations, which are aimed directly at them, restrict their rights to treat medical matters relating to abortions. This allegation can be fairly read to charge that the Abortion Regulations deprive Dr. Howard of his asserted right to offer abortions without substantial restrictions during the first trimester. In the instant case the defendants, pursuant to the Abortion Regulations, have the power to deny authorization to those seeking to operate an abortion facility [7] as well as the power to order

---

**6.** Section 9–5 of the Chicago Municipal Code states:

The president of the board of health, the assistant to the president of the board of health, the secretary of the board of health, the commissioner of health, and all physicians, employes or inspectors who may be designated by the board of health shall have full police powers and shall have the right to arrest or cause to be arrested any person who violates any of the health provisions of this code.

**7.** Abortion Regulations, *supra,* section II provides:

*Registration, Requirements and Standards:*

(a) No person shall maintain or operate or present himself as maintaining or operating an Abortion Service unless he has first registered such service with the Chicago Board of Health. Registration shall be made on forms furnished by the Chicago Board of Health and shall contain the information required therein. The Board of Health has the right of refusal to register any service that does not comply with the regulations of the Abortion Service. Any change in ownership, physician in charge, staff physicians, staff qualifications, extent of operations, location or affiliate hospital shall be reported to the Chicago Board of Health.

the closing of any facility that it deems not in compliance with its regulations.[8] Surely, those subject to such deprivations through the use of governmental power have a sufficient interest to maintain this type of action. *See* Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S. Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940).

In addition the defendants, pursuant to the Municipal Code of Chicago, have full police powers and the power to arrest. *See* note 6 *supra*. Whether proceedings brought under this section are characterized as quasicriminal, as the defendants asserted at oral argument, or criminal in nature, it is clear that they involve a deprivation of liberty. The plaintiffs in their action are the ones subject to this deprivation and accordingly have a requisite interest in attacking the validity of the challenged regulations.

The defendant takes the position that the Supreme Court's decision in Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), precludes the granting of standing to an individual who is merely threatened with prosecution, and that this is especially so where as in the instant case the plaintiffs have in fact complied with the challenged regulations and have received approval to operate their clinic from the Chicago Board of Health. We cannot agree that the threat of prosecution is so insufficient to deprive plaintiffs standing. While it is true that for the immediate present the plaintiffs are safe from any sort of prosecution because of their compliance with the Abortion Regulations, these regulations have a continuing effect. It is precisely this continuing restrictive effect placed on the plaintiffs by the regulations which is the basis of their complaint. In this case, unlike *Poe,* we are dealing with recently enacted ordinances that have potentially very real criminal sanctions.[9] Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), makes it very clear that physicians faced with criminal liability for the performance of an illegal abortion do have a sufficient interest to challenge the validity of the state's law.

We conclude, however, that the *physician-appellants,* who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable controversy and do *have standing despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution,* for violation of the State's

---

8. Abortion Regulations, *supra,* section XIX provides:

 *Closing Abortion Service:*

 Whenever an inspection determines that an Abortion Service has failed to register in accordance with Section II(a) of these regulations or continued operation of such an Abortion Service would be found to be in violation of any of the sections of the Abortion Service regulations, the Board of Health may direct the Commissioner of Health to order the discontinuance of operations until the Abortion Service is registered or until the Board of Health is satisfied that the violations are corrected, such order shall be served in writing personally, upon the owner or person in charge.

9. As the Court said in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973):

[In Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)] a sharply divided Court dismissed an appeal from a state court on the ground that it presented no real controversy justifying the adjudication of a constitutional issue. But the challenged Connecticut statute, deemed to prohibit the giving of medical advice or the use of contraceptives, had been enacted in 1879, and, apparently with a single exception, no one had ever been prosecuted under it. Georgia's statute, in contrast, is recent and not moribund. Furthermore, it is the successor to another Georgia abortion statute under which, we are told, physicians were prosecuted. The present case, therefore, is closer to Epperson v. Arkansas, 393 U.S. 97, 89 S. Ct. 266, 21 L.Ed.2d 228 (1968), where the Court recognized the right of a school teacher, though not yet charged criminally, to challenge her State's anti-evolution statute. 410 U.S. at 188–189, 93 S.Ct. at 746.

abortion statutes. The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. *They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.*

410 U.S. at 188, 93 S.Ct. at 745 (emphasis added).

Defendants contend, however, that despite the plaintiffs' interest in challenging the regulation, they cannot assert as one of the grounds of invalidity that the regulations violate a woman's right of privacy in deciding whether to abort a pregnancy. The district court relying on Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943) agreed with this contention. In *Tileston* the Supreme Court held that a physician was without standing to assert the rights of his patients in an action to declare a state anti-birth control statute unconstitutional. The Court said:

> The sole constitutional attack upon the statutes under the Fourteenth Amendment is confined to their deprivation of life—obviously not appellant's but his patients'. There is no allegation or proof that appellant's life is in danger. His patients are not parties to this proceeding and there is no basis on which we can say that he has standing to secure an adjudication of his patients' constitutional right to life, which they do not assert in their own behalf.

318 U.S. at 46, 63 S.Ct. at 494.

The Supreme Court has on a number of occasions distinguished its *Tileston* holding. In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), a physician was found to have standing to assert the constitutional rights of married individ-

uals with respect to the state statute forbidding the use of contraceptives. Similarly, in Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the Court found that a physician had the requisite standing to assert the rights of unmarried persons denied access to contraceptives. Admittedly, both *Griswold* and *Eisenstadt* rely in part on the fact that actual criminal convictions were involved. This fact, however, does not remove the present case from their mold. Although this case does not involve a present criminal prosecution, in our view the fact that the challenged regulations are aimed and operate directly on the plaintiffs, and are of a continuing nature, with potentially very real criminal consequences is sufficient to allow plaintiffs to assert the rights of their patients. Doe v. Scott, 321 F. Supp. 1385, 1387–1388 (N.D.Ill.1971) (three-judge court) vacated on other grounds, 410 U.S. 950, 93 S.Ct. 1423, 35 L.Ed.2d 683 (1973); Crossen v. Breckenridge, 446 F.2d 833, 839–840 (6th Cir. 1971).

*Griswold* and *Eisenstadt* are based in part on the type of relationship that existed between the plaintiff and the individual whose rights he is seeking to assert. In the abortion context the Supreme Court has recognized the need for patients to consult with their attending physician. Roe v. Wade, 410 U.S. at 163, 93 S.Ct. at 733, 35 L.Ed.2d 147. As such, the attending physician is integrally involved in the abortion decision itself. This is not, therefore, a case where one party seeks to raise the rights of another with whom he has only marginal involvement. Rather as the Court recognized in *Griswold* the rights being asserted were "likely to be diluted or adversely affected unless those rights are considered in a suit involving those who have this kind of confidential relation to [the one whose rights are raised]. . . ." 381 U.S. at 481, 85 S.Ct. at 1680.[10] The assertion by a

10. Similarly, the Court in Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed. 2d 349 (1972) said:

And so here the relationship between Baird and those whose rights he seeks to assert is not simply that between a distributor

third party of another's rights in appropriate circumstances is not a new principle. In Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), the Supreme Court allowed a seller of land to defend an action for damages for breach of a racially restrictive covenant on the grounds that the covenant violated the equal protection rights of prospective non-Caucasian purchasers. The Court said:

> Under the peculiar circumstances of this case, we believe the reasons which underlie our rule denying standing to raise another's rights, which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied by permitting the damages action to be maintained.

346 U.S. at 257, 73 S.Ct. at 1035. *See also* Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915).

It is not at all inconceivable that women who seek abortions will be dissuaded from challenging restrictions on their right to one during the first trimester, and will instead enter facilities that comply with the Board of Health's regulations. This would then leave unchallenged, except for the efforts of these plaintiffs, the allegedly impermissible restrictions on a pregnant woman's right of privacy.

Finally, there is another reason why we believe that plaintiffs should be permitted to assert the rights of pregnant women. To the extent that a woman's right to an abortion during the first trimester is a fundamental one, it would be a wholly undesirable situation for physicians to be placed in the position of guessing at the risk of criminal liability whether they could honor and give effect to that right.

and potential distributees, but that between an advocate of the rights of persons to obtain contraceptives and those desirous of doing so.
405 U.S. at 445, 92 S.Ct. at 1034.

For all of the foregoing reasons we believe the district court erred when it ruled that the plaintiffs could not attack the validity of the Abortion Regulations on the basis of right of privacy as espoused by the *Roe* decision.

### III

Having decided that the plaintiffs do have standing to claim the Abortion Regulations unduly infringe upon the privacy of their patients, it is next necessary to consider whether the regulations can stand in light of the Supreme Court's decisions in Roe v. Wade, 410 U.S. 113, 93 S.Ct 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 755, 35 L.Ed.2d 147 (1973).

In *Roe* the Court struck down as unconstitutional a Texas statute which made it a crime to procure or attempt an abortion except for the purpose of saving the life of the mother. The Court based its holding on a woman's fundamental right of privacy. It stated:

> *This right of privacy,* whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, *is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.*

410 U.S. at 153, 93 S.Ct. at 727 (emphasis added).

The Court went on to say, however:

> [T]hat the right, nonetheless, is not absolute and is subject to some limitations, and that at some point the state interests as to protection of health, medical standards, and prenatal life, become dominant.

410 U.S. at 155, 93 S.Ct. at 728.[11]

11. In the same regard the Court said:
 As we have intimated above, it is reasonable and appropriate for a State to decide that at some point in time another interest, that of health of the mother or that

The Court in the course of its opinion made it very clear that prior to the end of the first trimester governmental concern with respect to maternal health could not be sufficient to overcome a woman's right to decide to abort a pregnancy.

With respect to the State's important and legitimate interest in the health of the mother, *the "compelling" point,* in the light of present medical knowledge, *is at approximately the end of the first trimester.* . . . It follows that, *from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.* Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.

This means, on the other hand, that, *for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.*

410 U.S. at 163, 93 S.Ct. at 731 (emphasis added).

The regulations that we have previously summarized are quite extensive and are applicable to any place or facility in which abortions are performed [12] without regard to the trimester involved. For the following reasons our reading of the foregoing language compels us to conclude that the Abortion Regulations adopted by the Chicago Board of Health cannot stand.

The defendants contend that notwithstanding the above language, that since their regulations are reasonably related to legitimate state interests—protecting the health and safety of the mother—that they therefore do not run afoul of any constitutional prohibition. They concede that the Supreme Court found that the abortion procedure, at least during the first trimester, was no more dangerous than normal childbirth. *Roe, supra,* at 149, 93 S.Ct. at 725. They argue, however, that the Supreme Court used this fact to hold only that it was state laws prohibiting all, or the great majority of abortions that could no longer be justified by maternal health considerations. Thus, they conclude that the Supreme Court in *Roe* and *Doe* passed no judgment on the question of whether there was a sufficient governmental interest during the first trimester to place reasonable health and safety requirements on the abortion procedure. We do not view the Supreme Court's language as narrowly.

It is true that a state and under appropriate authorization, local governmental units have broad powers to establish and enforce standards for the purpose of protecting the health of its citizens. Barsky v. Board of Regents, 347 U.S. 442, 449, 74 S.Ct. 650, 98 L.Ed.

---

of potential human life, becomes significantly involved. The woman's privacy is no longer sole and any right of privacy she possesses must be measured accordingly.
410 U.S. at 159, 93 S.Ct. at 730.

12. Defendants at oral argument contended that the regulations would not be applicable to an individual practitioner's office. We

disagree with their assertion. Section I(a) defines an "Abortion Service" as "a place or facility in which abortions are performed," and section II(c) states:
An abortion shall be performed only by a physician . . . in an Abortion Service operated in accordance with the provisions of these regulations.
Abortion Regulations, *supra,* section II(c).

829 (1954). Under traditional analysis, exercise of the police power need only bear some rational relationship to a legitimate governmental interest. Williamson v. Lee Optical, Inc., 348 U.S. 483, 488–91, 75 S.Ct. 461, 99 L.Ed. 563 (1955). It is quite conceivable that under this standard the Abortion Regulations would be upheld, although on the record before this court there is no basis for determining whether the regulations are even reasonably related to a valid state concern.

■ The Supreme Court, however, has determined that where fundamental rights are involved regulations limiting these rights may be sustained only by a "compelling state interest." Kramer v. Union Free School District, 395 U.S. 621, 627–28, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Despite the laudable goals of the Chicago Board of Health in attempting to set comprehensive safety standards for all abortion procedures, *Roe* will not allow these regulations to stand. The Court's language makes abundantly clear that it is not until "from and after" the first trimester that a state may regulate abortions by regulations "reasonably relate[d] to the preservation and protection of maternal health." *Roe, supra,* 410 U.S. at 163, 93 S.Ct. at 732.

If there was any doubt as to whether the Supreme Court was declaring broad health and safety regulations for first trimester abortions impermissible, it was cleared up by the Court's description of what became permissible *after* that period. It was only after the "compelling point" that the Court said permissible state regulations could include requirements as to the specialty qualifications of the person who is to perform the abortion,[13] the type of facility where it might be performed and similar types of regulations. *Roe, supra,* 410 U.S. at 163, 93 S.Ct. at 731–732. That the Court was referring to health and safety type regulations, is supported by another section of its opinion.

The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise. The prevalence of high mortality rates at illegal "abortion mills" strengthens, rather than weakens, the State's interest in regulating the conditions under which abortions are performed. Moreover, the risk to the woman increases as her pregnancy continues. Thus, *the State retains a definite interest in protecting the woman's own health and safety when an abortion is proposed at a late stage of pregnancy.*

410 U.S. at 150, 93 S.Ct. at 725 (emphasis added).

In Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 755, 35 L.Ed.2d 147 (1973), the Court decided that the Georgia statute requiring that abortions be performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals (JCAH) could not withstand constitutional scrutiny. After holding that the JCAH accreditation requirement was

---

13. The precise language of the Court is "requirements as to the qualifications of the person who is to perform the abortion." *Roe, supra* 410 U.S. at 163, 93 S.Ct. at 732. While it might be possible to interpret this language to mean that the state cannot require that a physician perform an abortion during the first trimester, we believe the better view of this language is to the effect that after the first trimester the state may require that a physician with a specialty is required to perform all abortions. This view is supported by the fact that throughout the opinion the Court considers the physician as playing an integral role in any abortion decision. Furthermore the Court went on to say, without reference to the trimester involved that "[t]he state . . . may proscribe any abortion by a person who is not a physician. . . . " *Roe, supra* 410 U.S. at 165, 93 S.Ct. at 733.

not reasonably related to the purposes of the Act in which it was found the Court stated:

> This is not to say that Georgia may not or should not, *from and after the end of the first trimester*, adopt standards for licensing all facilities where abortions may be performed so long as those standards are legitimately related to the objective the State seeks to accomplish.

410 U.S. at 194–95, 93 S.Ct. at 749 (emphasis added).[14]

■ We are not the first court to conclude that the fundamental right of privacy as described in *Roe* and *Doe* is expansive enough to include within its purview governmental regulations that seek to regulate abortion facilities during the first trimester. In Word v. Poelker, 495 F.2d 1349 (8th Cir. Feb. 20, 1974), the Eighth Circuit in striking down a St. Louis ordinance similar to the one involved here said:

> The city ordinance in question here reflects no recognition of the fundamental rights involved and the commensurate restrictions on state action.
>
> \* \* \* \* \*
>
> We hold that St. Louis city ordinance No. 56579 is, by reason of its failure to exclude the first trimester of pregnancy, an invalid and overbroad enactment infringing unreasonably upon fundamental rights.

*Id.* at 4. *See also* Coe v. Gerstein, 376 F.Supp. 695 (S.D.Fla. Aug. 13, 1973).

The appellees seek to escape the mandate of *Roe* and *Doe* by contending that they were premised on state interference with a woman's right of privacy, at least in the first trimester, to *decide* to abort a pregnancy, and that the challenged regulations in the instant case do not affect the "abortion decision." We disagree. The regulations by their very nature restrict the abortion decision and affect whether and in what manner an abortion will take place. The decision whether or not to abort a pregnancy cannot be made in a vacuum without regard to who will perform the operation, where and under what conditions it will be performed, and what procedure will be followed. All these are involved in any abortion decision and it is precisely these elements of the decision that the regulations challenged here seek to control. The language in *Roe* and *Doe* makes very clear that even after the decision to abort a pregnancy is made that decision must be able to be "effectuated by an abortion free of interference by the State." *Roe, supra* 410 U.S. at 163, 93 S.Ct. at 732.

■ *Roe* and *Doe* compel us to conclude that the fundamental right of privacy includes, at least during the first trimester of pregnancy, the right to be free from governmental regulations that have an effect on the abortion decision.[15]

---

14. There is at least one part of the *Doe* opinion that might be read as allowing limited health regulations on facilities offering abortions during the first trimester. The Court said:

> We feel compelled to agree with appellants that the State must show more than it has in order to prove that only the full resources of a licensed hospital, rather than those of some other *appropriately licensed* institution, satisfy these health interests. We hold that the hospital requirement of the Georgia law, because it fails to exclude the first trimester of pregnancy . . . is also invalid.

410 U.S. at 195, 93 S.Ct. at 749 (emphasis added).

We find however, that the language at best only implies that health regulations may be imposed on abortion facilities and that this implication flies in the face of the more direct and controlling language that we have set out in our opinion.

15. The Supreme Court's conclusion that regulations during the first trimester must be essentially limited to requiring a licensed physician has not escaped criticism.

> The fact that childbirth causes more women to die than do first-trimester abortions obviously does not warrant the Court's conclusion that state controls over first-trimester abortion procedures must be limited to requiring a licensed physician, or indeed that such controls must be limited to whatever state regulations exist governing medical practice generally. For it is conceivable that even very early abor-

One look at the challenged regulations, summarized previously, show that they regulate during the first trimester precisely the type of things that the Supreme Court has said cannot be regulated until after that "compelling point."

 There is another reason as well why the Chicago Board of Health's regulations cannot stand. The district court in its opinion stated that:

> [P]hysicians performing abortions are selected from their profession to be subject to special regulations; but such discrimination is not unlawful when, as in this case, it is not arbitrary, unreasonable or unrelated to the governmental interests involved.

367 F.Supp. at 603.

We disagree with this reasoning of the district court.

It is clear that:

> The Equal Protection Clause . . . does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 563, 64 L.Ed. 989 (1920).

Reed v. Reed, 404 U.S. 71, 75–76, 92 S. Ct. 251, 253–254, 30 L.Ed.2d 225 (1971).

*Roe* established that the decision to abort a pregnancy during the first trimester was within a woman's right of privacy, which right has been held to be fundamental. *Roe, supra* 410 U.S. at 155, 93 S.Ct. at 727, *accord,* Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). Where fundamental rights are involved, it is impermissible to treat differently two classes which do not differ on any ground related to the purpose of the challenged statute. Doe v. Bolton, 410 U.S. 179, 194, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). Given the Supreme Court's acceptance of the medical fact that the mortality rate of women receiving legal abortions is "as low as or lower than the rates for normal childbirth," *Roe, supra* 410 U.S. at 149, 93 S.Ct. at 725, there would seem to be little justification for more extensive governmental regulations, purportedly based on health considerations, for one procedure than the other. Doe v. Hale Hospital, 500 F.2d 144 (1st Cir. 1974).

The Chicago Board of Health's Rules on Abortion Services regulate comprehensively physicians who perform abortions, while at the same time leaving other medical procedures, often much more complex and dangerous in terms of the patient's health, up to the good judgment of the physician. The challenged regulations describe what equipment and supplies must be available, what medical tests must be performed, a minimal time interval between initial examination and termination of the pregnancy and what post-operative care shall be rendered.

The Chicago Municipal Code section on dispensaries [16] does not regulate oth-

---

tions would in some particular category of cases pose substantial and distinctive risks to maternal life or health unless specified procedures were complied with. So long as procedural requirements defended in terms of health are not used as a subterfuge to forbid early abortions on other grounds, the argument for their imposition by law seems compelling enough to justify their promulgation and enforcement.
Tribe, The Supreme Court 1972 Term—Foreward: Toward a Model of Roles In Due Process of Life and Law, 87 Harv.L.Rev. 1, 30 (1973).

16. We use the local ordinances on dispensaries for comparison purposes as opposed to the ordinance on hospitals (Municipal Code of Chicago, ch. 137) because the Supreme Court has clearly decided that any state regulation requiring hospitalization for the performance of an abortion during the first trimester is impermissible. Doe v. Bolton, 410 U.S. at 195, 93 S.Ct. at 739.

er medical procedures as extensively; instead it leaves these matters to the discretion of the physician. The Board of Health has offered no sufficiently compelling reason to justify this difference in treatment. Similar reasoning was employed by the Supreme Court when it struck down the Georgia provision requiring two-doctor concurrence before an abortion could be authorized. The Court said:

> [N]o other voluntary medical or surgical procedure for which Georgia requires confirmation by two other physicians has been cited to us. If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies.

Doe v. Bolton, 410 U.S. 179, 199, 93 S. Ct. 739, 751, 35 L.Ed.2d 201 (1973).

Recently, the Eighth Circuit when dealing with regulations that were similar to the one's challenged here said:

> We think that this myriad of requirements is unduly restrictive of a physicians's right to administer his judgment as to an operation that is now established to be, within the first trimester of pregnancy, safer than

childbirth. We are referred to no other single surgical procedure where doctors are required to "prove up" their overall fitness as they are here. Word v. Poelker, *supra* at 6,[17] 495 F.2d at 1351.

Thus, because the defendant treats differently without a compelling reason medical procedures which in terms of health risks are not distinguishable and because this difference in treatment affects adversely fundamental rights, the challenged regulations cannot be allowed to remain in effect.

### IV

We have determined that given the "fundamental right" status of a woman to terminate her pregnancy during the first trimester, that in no circumstances could we allow to stand regulations, purporting to promote maternal health, that are more expansive than regulations that are applied to other medical procedures of the same risk and complexity. There is nothing to indicate in this case, that the Chicago Board of Health seeks to regulate any other medical procedure except in the most general of terms.[18] Furthermore, any proposed regulation, even if applied universally to all similar medical procedures, because

---

From the definition of dispensaries, it seems clear that the requirements of the ordinance would be applicable to abortion clinics. Municipal Code of Chicago, ch. 118, § 1.1. It should be noted, however, that the dispensary provisions do not purport to cover a doctor's office. *Id.* § 1.2.

The only restrictive requirements placed on dispensaries are: a requirement that complete medical records be kept, *Id.* § 6; the reporting of all contagious, epidemic, or communicable diseases, § 7; and a general requirement that: "Every person conducting or operating a dispensary shall keep the rooms, equipment, and apparatus of such dispensary in a clean and sanitary condition." *Id.* § 8.

17. Similarly, a three-judge district court said:

Plaintiffs assail the regulation [requiring hospital affiliation] on several grounds. Their leading argument is that *Roe* and *Doe* exempted first-trimester abortion facilities from any licensing requirements that do not

apply to medical facilities generally. We agree. [Citations omitted.] Under *Roe* and *Doe*, if North Carolina may regulate the performance of first-trimester abortions at all, it may do so only to the extent that it regulates tonsillectomies and other relatively minor operations. . . . Doctors may perform other medical procedures—including minor surgery and obstetrical delivery, which is considered more dangerous than first-trimester abortion—[footnote omitted] away from hospitals, with neither a transfer agreement nor active staff privileges. [Citation omitted.] That the state is ordinarily willing to leave such matters to the professional judgment of the attending physician strongly suggests that the program for regulating abortion clinics is a thinly disguised effort to evade *Roe* and *Doe.*

Hallmark Clinic v. Department of Human Resources, 380 F.Supp. 1153 (E.D.N.Cal. 1974).

18. *See* note 16, *supra.*

of the fundamental right of a woman to procure an abortion during the first trimester, would have to meet a compelling governmental interest requirement. Thus, any general health regulations which would apply to first trimester abortions would have to be limited so as to give effect to the fundamental rights as established by *Roe* and *Doe*; that is not be burdensome on a woman's right to decide to abort a pregnancy. By this we mean that in all probability nothing broader than general requirements as to the maintaining of sanitary facilities and general requirements as to meeting minimal building code standards would be permissible.

We do not, however, completely rule out the possibility that there exist some inherent aspects of an abortion procedure which make it unique from other medical procedures of substantially the same risk. For such aspects, the Board of Health may be able to show that a narrowly drawn health regulation is compelling. Again we should point out that the state will bear a heavy burden in justifying any such regulation, both with respect to showing the existence of a unique medical complication and with respect to showing that the problem is of such a nature as to be beyond the general scope of a doctor's professional judgment.

Because it is clear that the challenged regulations here, even if interpreted in a limited manner, could not meet the standards we have set for the first trimester of pregnancy, we declare them invalid.

We reverse the judgment of the district court and remand with directions to enter an order consistent with this opinion granting plaintiffs' requested relief.[19]

FAIRCHILD, Circuit Judge (concurring).

I agree that plaintiffs have standing to challenge the Board of Health regulations as infringing upon their patients' right to privacy. I agree that language in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 755, 35 L. Ed.2d 147 (1973) must mean that regulations of the type here involved, exclusively applicable to abortion procedures and applicable whether or not an abortion is within the first trimester, violate the right to privacy. I respectfully disagree, however, with two propositions set forth in Part IV of this court's opinion.

First, the majority indicates, apparently as dictum, that any general regulation of a broad class of medical and surgical procedures within which abortion would fall, must satisfy a "compelling governmental interest requirement" before it can be applied to abortions during the first trimester and therefore would probably be limited to general sanitary and structural codes. I do not

---

19. From and after the first trimester according to the Supreme Court in *Roe*, the state has a legitimate interest in maternal health and "may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." 410 U.S. at 163, 93 S.Ct. at 732. Even if the challenged regulations here were interpreted as applying only to the period after the first trimester, there is no basis in the record upon which this court could make a determination as to which of these regulations were reasonably related to a valid state interest.

While under a rational relationship type test a municipal ordinance pursuant to its police powers will be given great deference, Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); McGowan v. Maryland, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 6 L.Ed.2d 363 (1961), it must be remembered that at the end of the first trimester a woman does not lose completely her right of privacy. See note 11, *supra*. The Supreme Court held in *Roe* that at that point a legitimate state interest in the health of the mother accrues. Thus, any regulation dealing with maternal health after the end of the first trimester must not only be reasonably related to a valid health purpose, but must have appropriate regard to the still existing right of privacy of the mother. Exactly where this balance is to be struck will have to be decided on a case by case basis.

believe that *Roe* requires such a result. While recognizing that abortion during the first trimester is as safe as normal childbirth and that special State interest in protecting the patient from an inherently dangerous surgical procedure has thus largely disappeared during this period, the Supreme Court noted that:

> "Of course, important state interests in the areas of health and medical standards do remain. The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise." Roe v. Wade, *supra*, 410 U.S. at 149–150, 93 S.Ct. at 725.

This language indicates, I believe, that special regulation aimed expressly or in fact at abortions, including those conducted during the first trimester, such as in the present case, impermissibly limits the patient's constitutional right to privacy by imposing a burdensome, extra layer of requirements upon a surgical process deemed indistinguishable from similar medical procedures. Nevertheless, regulation of the safety of all these procedures, incidentally including first trimester abortions, through imposition of generally applicable regulations, would seem to be a valid exercise of the State's interest in protecting health and need only satisfy the traditional tests of judicial scrutiny imposed in this area. Barsky v. Board of Regents, 347 U.S. 442, 449, 74 S.Ct. 650, 98 L.Ed. 829 (1954).[1]

Second, while I agree that it is inappropriate to save the regulations under consideration here by construing them as excluding abortions performed during the first trimester, I do so because of the difficulty and confusion which would probably result from such exception by construction. The majority, however, in rejecting the saving-by-construction course asserts that there is no basis in the record for a determination as to which of the regulations, even if so limited, are reasonably related to a valid State interest. This places the burden of establishing the constitutionality of challenged regulations on the State. In the case, however, of regulations of the period after the first trimester, when the State has a "compelling interest" in regulation of the abortion procedure, Roe v. Wade, *supra*, 410 U.S. at 163, 93 S.Ct. 705 such regulations are, in my opinion, entitled to presumptive validity, and the burden of establishing lack of reasonable relationship to permissible objectives should be left with the charging party. Compare, Morales v. Schmidt, 494 F.2d 85, 88 (7th Cir. 1974) (Stevens, J., concurring).

With the exception of the above issues, I concur in Judge Sprecher's thoughtful opinion.

---

1. It goes without saying, that any such generally applicable regulation including first trimester abortion procedures within its scope, which fail reasonably to relate to safety concerns presented by this type of medical procedure, would fail.