**William BAIRD et al., Plaintiffs, Appellees,**

**v.**

**DEPARTMENT OF PUBLIC HEALTH OF the COMMONWEALTH OF MASSACHUSETTS, et al., Defendants, Appellants.**

No. 78–1532.

United States Court of Appeals, First Circuit.

Argued March 12, 1979.

Decided June 19, 1979.

Thomas Miller, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for defendants, appellants.

Roy Lucas, Washington, D. C., with whom Calvin Steinmetz, Washington, D. C., and Joan C. Schmidt, Boston, Mass., were on brief, for plaintiffs, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This is an appeal by the Massachusetts Department of Public Health (DPH) from a judgment declaring unconstitutional, and enjoining enforcement of, the Massachusetts clinic licensure law, Mass.Gen.L. ch. 111, §§ 50–57C, and the Massachusetts Rules and Regulations for the Licensure of Clinics, 13 C.M.R. Pt. 9 at 985 (1964) (herein referred to collectively as the "clinic licensure provisions"), insofar as they apply to the plaintiffs' ambulatory health care center (the "Parents' Aid Society Center" or "Baird Center"), which performs only first trimester abortions and related services.[1]

We are asked to decide whether, under *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its progeny, states are prohibited from requiring facilities offering only first trimester abortion services to obtain licenses to operate, even where application of the state's licensing provisions is triggered solely by the fact that the facility has been determined to be a clinic, and not by the fact that it offers abortion services.

The Massachusetts clinic licensure statute is, on its face, "abortion neutral." It covers,

"any institution or place, however named, conducted for charity or profit, which is advertised, announced, established or maintained under the name of a clinic for the purpose of providing medical, surgical, dental, restorative or mental hygiene services to persons not residing therein. Clinic shall include such places as 'medical associates', 'dispensary', 'medical center', 'medical institute', 'rehabilitation center', 'rehabilitation institute', 'memorial', 'association', or such other designation of like import but not necessarily limited to the above mentioned. . . . Clinics shall not provide overnight care."

Mass.Gen.L. ch. 111 § 52.

The clinic licensure statute provides, *inter alia,* that, "No original license shall be issued to establish or maintain . . . a clinic, unless there is a determination by the [DPH] that there is a need for such facility at the designated location," and that no license shall issue unless a clinic has passed inspections by the department of public safety and the local fire department for adequate egresses and means of fire prevention and extinguishment, and for compliance with local ordinances. Mass.Gen.L. ch. 111 § 51. The DPH is instructed to promulgate, in addition, rules and regulations for the conduct of clinics, including, "requirements for diagnostic and therapeutic facilities . . . and the keeping of proper medical records," Mass.Gen.L. ch. 111 § 53, and is to order audits of medical records of clinics "when deemed necessary," Mass.Gen.L. ch. 111 § 54. The penalties for

---

1. The present litigation evolved from a suit commenced in 1973, seeking invalidation of Massachusetts' "Regulations for Ambulatory Gynecological Surgery in Licensed Hospitals and Licensed Clinics," 13 C.M.R. Pt. 9 at 1461 (1973), as applied to abortion clinics. Massachusetts later ceased to apply these regulations to the Baird Center. In June 1978, however, after the DPH ruled that the Baird Center was required to obtain a license in accordance with the state's clinic licensure provisions, plaintiffs amended their 1973 complaint to substitute those provisions for the original Gynecological Surgery regulations, and petitioned for a declaratory judgment and injunction. Pending judicial action, plaintiffs filed a license application with the DPH in July. The case was heard by the United States District Court in August, and a permanent injunction was issued on October 5, 1978.

operating a clinic without a license or for violating the licensure provisions range up to a maximum of two years imprisonment and a fine of $1,000 for each offense. Mass. Gen.L. ch. 111 § 56.

The regulations that have been promulgated by the DPH under Chapter 111 establish a number of requirements, of which the following appear to be the most burdensome: A registered physician must be in attendance "at all times during . . . clinic hours," with an exception for, *inter alia*, "Special Clinics" [2]; a registered nurse must "be responsible for the nursing service and in attendance during all . . . clinic hours"; and certain record-keeping requirements must be complied with, including the filing of an "Annual Dispensary or Clinical Statistical Report." Beyond this, the regulations are unexceptional: for example, they require the clinic to be accessible to "ambulatory and/or handicapped individuals," and to have an office, a waiting room, examining and treatment rooms, a separate clean-up room, toilet, hand-washing and storage facilities, and adequate ventilation, lighting and heat. These requirements appear to do little more than necessary to ensure sanitation, orderliness, and the privacy and comfort of patients.

In May 1978 the DPH determined that the Parents' Aid Society Center was a "clinic" and hence subject to these regulations. It then informed the Center by letter that, in order to obtain the required license under the provisions just reviewed, it would have to, (1) submit an application to the DPH; (2) obtain a Determination of Need from the Office of Health Facilities Development; (3) obtain approval of its architectural plans from the Bureau of Engineering and Construction; (4) obtain a Certificate

of Inspection from the Department of Public Safety; and (5) obtain a Fire Certificate of Inspection from its local fire department. Receipt of the necessary approvals obviously would depend on compliance with the substantive requirements outlined above.

The record before the district court included, in addition to the clinic licensure provisions and the letter just described, an affidavit of a DPH official stating that the Parents' Aid facility had been determined to be a clinic and as such was required to comply with the licensure provisions, and that it had filed an application in July 1978.[3] No facts were disputed, and no evidence was introduced as to the impact of these regulations on the ability of the facility to carry out its mission. Specifically, there was no evidence as to whether the clinic would be granted a Certificate of Need and a DPH license, or whether compliance with the licensure provisions would be so burdensome as to affect the availability of abortions, as by requiring the clinic to close or to raise its charges significantly. Nor was there any evidence as to whether the provisions were reasonable health regulations. *See Sendak v. Arnold*, 429 U.S. 968, 969, 971, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976) (White, J., dissenting). Plaintiffs' position, which was accepted by the district court, is that such evidence is not required; the constitutional infirmity, they argue, stems from the very application of regulations of this type to first trimester abortions and is apparent from their face. With this bald proposition we disagree.[4]

*Roe* and its companion case, *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), addressed state laws directed specifically at abortions. *Roe* held that

---

2. It is not readily apparent what "Special Clinics" includes or whether this term could encompass the Baird Center.

3. Depositions of William Baird and of the medical director of the clinic were taken in December 1974, when the Gynecological Services regulations were still the focus of this litigation, but were not germane and were not relied on by the court.

4. Plaintiffs enumerate the requirements imposed by the Massachusetts clinic licensure provisions and assert that they "unduly burden the abortion decision during the first trimester," but there is no evidence in the record as to whether or how these regulations would affect the abortion decision. Hence we confine ourselves here to considering the broad proposition, that no licensing regulations of any kind may be applied to facilities offering only first trimester abortions.

states may not regulate or prohibit abortions during the first trimester of pregnancy. 410 U.S. at 164, 93 S.Ct. 705. The interest protected by this holding was a woman's right, in consultation with her physician, to make her own decision about abortion during a stage when the state has insufficient interest in that decision to be entitled to influence or restrict it. *See* 410 U.S. at 153–54, 162–63, 93 S.Ct. 705. The Supreme Court has since reemphasized that the constitutional prohibition of *Roe* is against interfering with "the abortion decision or . . . the physician-patient relationship" during the first trimester. *Planned Parenthood v. Danforth,* 428 U.S. 52, 81, 96 S.Ct. 2831, 2846, 49 L.Ed.2d 788 (1976).

In the course of its opinion in *Roe* the Court said,

"With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point . . . is at approximately the end of the first trimester. . . . [F]rom and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic . . . ., *as to the licensing of the facility;* and the like.

"This means . . . that, for the [first trimester], the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that . . . the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State."

410 U.S. at 163, 93 S.Ct. at 731–732 (emphasis added).

It was on this passage, and particularly on the portion we have emphasized, that the district court relied. We disagree, however, that the quoted passage means that no regulations whatever may be applied to first trimester abortions. Under such a reading, the same passage would also preclude any state requirement that first trimester abortions be performed by physicians, since the passage gives as another example of permissible state regulation in the period after the first trimester "requirements as to the qualifications of the person who is to perform the abortion," and "the licensure of that person." 410 U.S. at 163, 93 S.Ct. at 732. But in *Roe* itself, the Court stated explicitly that, "the State . . . may proscribe any abortion by a person who is not a physician," 410 U.S. at 165, 93 S.Ct. at 732–733, and in *Connecticut v. Menillo,* 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975), it upheld the right of a state to enforce criminal abortion statutes against nonphysicians, even as to abortions performed during the first trimester, *id.* at 11, 96 S.Ct. 170. In neither instance did it perceive any conflict with the above quoted passage in *Roe.* One court therefore has interpreted this passage to mean, "that after the first trimester the state may require that a physician *with a specialty* is required to perform all abortions." *Friendship Medical Center Ltd. v. Chicago Board of Health,* 505 F.2d 1141, 1150 n. 13 (7th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975) (emphasis added). Whatever the precise significance of the Court's reference to the licensing of abortion facilities in the same passage, we do not take it to mean that states cannot require facilities performing only first trimester abortions to have any kind of clinic license at all.

Since *Roe,* the Supreme Court has made it clear that reasonable state regulations not designed to impinge upon the abortion decision may be applied to first trimester abortions. In *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), it held that recordkeeping requirements can be imposed on physicians and facilities performing first trimester

abortions, even though such regulations differ from those imposed on other, comparable medical procedures. Id. at 80–81, 96 S.Ct. 2831. The Court saw in the regulations in issue "no legally significant impact or consequence on the abortion decision or on the physician-patient relationship." Id. at 81, 96 S.Ct. at 2846.

The Massachusetts clinic licensure provisions in issue appear to have still less impact on the rights protected by Roe. They do not relate specifically to abortions. They do not state that all or even any abortions must be performed in licensed clinics—nothing in them, for example, limits a doctor's right to perform an abortion in his office or in some other place. They require only that all clinics in Massachusetts be licensed, regardless of what services they offer, and the record contains no evidence from which we can determine that any requirement in the regulations will have a "legally significant impact or consequence on the abortion decision or on the physician-patient relationship," Danforth, 428 U.S. at 81, 96 S.Ct. at 2846. Nor is there any evidence that Massachusetts is applying its clinic licensure provisions selectively to evade the prohibition of Roe v. Wade.

 Without evidence that the regulations are unreasonable in terms of protecting the public health and safety or that they will impact in some legally significant manner upon the availability of abortions, we cannot draw plaintiffs' conclusions. The fact that the provisions apply generally to health care facilities of all kinds, and do not single out abortions, suggests that they reflect a neutral evaluation and selection of standards deemed necessary to safeguard the public. Whether and in what circumstances such neutral regulations might ever be unconstitutional because excessively and unreasonably burdensome with respect to the abortion decision, compare Sendak v. Arnold, 429 U.S. 968, 969, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976) (White, J., dissenting), and Friendship Medical Center v. Chicago Board of Health, 505 F.2d 1141, 1155 (Fairchild, J., concurring), with Friendship Medi-

cal Center, 505 F.2d at 1153–54, is not a question we can decide on this record. When confronting broadly-based, facially neutral regulations of this type, a lay tribunal lacks both the knowledge and expertise to evaluate the question of burdensomeness on its own; evidence, including expert evidence, would be essential for this purpose. In the absence of such evidence, we can only assume that the regulations reflect a proper and, in the case of abortions, non-excessive, exercise of the state's power to safeguard the general health, safety and welfare.

On the showing made, we conclude that the district court erred in declaring that Massachusetts cannot constitutionally apply its clinic licensure provisions to first trimester abortion clinics. There is room under Roe for states to apply the same licensing standards to abortion facilities as they apply to like facilities performing medically analogous procedures, as long as they do not do so in a way that evades Roe by impinging on a woman's right to elect and obtain an abortion during the first trimester. Hodgson v. Lawson, 542 F.2d 1350, 1358 (8th Cir. 1976); Friendship Medical Center, supra, 505 F.2d at 1155 (Fairchild, J., concurring); Abortion Coalition v. Michigan Department of Public Health, 426 F.Supp. 471 (E.D.Mich.1977); Hallmark Clinic v. North Carolina Department of Human Resources, 380 F.Supp. 1153, 1157 (E.D.N.C.1974), aff'd on different issue, 519 F.2d 1315 (4th Cir. 1975); see Planned Parenthood v. Citizens for Community Action, 558 F.2d 861, 868 n. 7 (8th Cir.); Doe v. Hale Hospital, 500 F.2d 144, 147 (1st Cir. 1974), cert. denied, 420 U.S. 907, 95 S.Ct. 825, 42 L.Ed.2d 837 (1975); cf. Maher v. Roe, 432 U.S. 464, 474, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); Sendak v. Arnold, 429 U.S. 968, 969, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976) (White, J., dissenting).

This is not to pass judgment on whether or not any of the particular regulations promulgated by the DPH under Chapter 111 are excessive, in that they impose an unreasonable burden on the abortion decision during the first trimester. As we have

indicated, that issue cannot be considered on this record. Nor do we sanction use by Massachusetts of its clinic licensure laws in some selective manner aimed at restricting a woman's right to an abortion during the first trimester. In *Danforth,* the Supreme Court stated that its approval of the first trimester recordkeeping requirements in issue assumed that, "they will not be utilized . . . to accomplish, through the sheer burden of recordkeeping detail, what we have held to be an otherwise unconstitutional restriction." *Id.,* 428 U.S. at 81, 96 S.Ct. at 2847. Our decision here is predicated on a similar assumption.

*Reversed.*[5]

---

5. In light of the decision herein, it is not necessary to address the class action aspects of this appeal and the questions whether William

Baird and the Department of Public Health are proper parties.