**ABORTION COALITION OF MICHIGAN, INC., et al., Plaintiffs,**

v.

**MICHIGAN DEPARTMENT OF PUBLIC HEALTH et al., Defendants.**

**Civ. A. No. 76–70623.**

United States District Court,
E. D. Michigan, S. D.

Feb. 3, 1977.

Roy Lucas, Lucas & Stoltz, Washington, D.C., for plaintiffs.

Frank J. Pipp, Asst. Atty. Gen., Lansing, Mich., for defendants.

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CORNELIA G. KENNEDY, District Judge.

This is a civil action for declaratory relief, challenging the constitutionality of Public Act 274 of 1974, M.C.L. §§ 331.471, *et seq.,* M.S.A. §§ 14.1179(71), *et seq.,* and the regulations promulgated thereunder, Michigan Administrative Code (M.A.C.) R325.3801, *et seq.* (Supp. 86, May 15, 1976), which provide for the licensing and regulation of "freestanding surgical outpatient facilities" (hereinafter "FSOF"s), which are defined as "establishment(s) offering any type of surgical procedures and related care which in the opinion of the attending physician can be safely performed without requiring inpatient overnight hospital care and exclusive of surgical and related care as licensed physicians may ordinarily elect to perform in their private offices." § 2(1). Plaintiffs include the Abortion Coalition of Michigan, Inc., a non-profit organization of physicians, clinics, and individuals whose "avowed purpose is to protect women's rights in the area of reproductive medicine;" the National Organization of Women, Northwest Wayne County Chapter; several physicians who perform abortions at FSOFs; and a registered nurse employed by an FSOF. While these plaintiffs sue "on behalf of pregnant women who intend to terminate their pregnancies," no such woman is among the named plaintiffs. Defendants are the Michigan Department of Public Health,

which is authorized to promulgate and enforce regulations implementing the Act; Maurice Reizen, the Director of the Department; and Frederick Traill, the Department of Public Health's chief of the Division of Standards and Licensing.

Plaintiffs' primary cause of action is based on the fundamental "right of privacy" aspect of the Fourteenth Amendment's Due Process Clause, as set forth by the Supreme Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Plaintiffs also challenge the Act and regulations on equal protection grounds; although the Act in terms applies to all FSOFs, regardless of the types of surgery performed, it is claimed that the vast majority of FSOFs are abortion clinics, and that the Department of Public Health is only seeking to regulate FSOFs where abortions are performed.

The complaint challenges the Act and regulations *in toto.* First, plaintiffs urge that the Act's failure to exclude from all regulation those facilities performing only first trimester abortions renders it facially overbroad, since *Roe* and *Doe* prevent the State from interfering in any way with abortions during this period of pregnancy. (In fact, Rule 51 permits abortions to be performed in FSOFs during the first 14 weeks of pregnancy only—roughly, the first "trimester"). In addition, plaintiffs also attack particular sections of the Act and regulations, including § 3(3), which requires FSOFs to have a written transfer agreement with a nearby licensed hospital for emergency situations; Rule 28, which requires a responsible relative's informed consent to any surgery performed on minors; § 8, which subjects plans for all new construction and modernization of FSOFs to the prior approval of the Department of Public Health; and § 21, which bans all advertising by FSOFs. § 22 makes the violation of any section of the Act a criminal misdemeanor.

At a prior hearing conducted on April 9, 1976, the Court denied plaintiffs' request for a temporary restraining order because the record at that time indicated only that the State had begun a program of surveys, discussion, and explanation of these regulations; there was then no evidence of "irreparable harm" likely to ensue from the denial of immediate relief. The Court also noted at that hearing that all plaintiffs except Patricia Savino, R. N., appeared to have standing to assert not only their own rights, but also the rights of pregnant women recognized in *Roe* and *Doe* insofar as they may be affected by the regulatory scheme at issue. Thereafter, in an Opinion and Order entered on July 22, 1976, the Court denied defendants' "Application for Convening of Three-Judge Court," since plaintiffs had previously withdrawn their request for injunctive relief.

Plaintiffs have now filed a motion for summary judgment, asserting that the Act and regulations should be declared unconstitutional as applied to first trimester abortion facilities on the basis of the Supreme Court's decision in *Sendak v. Arnold,* —— U.S. ——, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976). Defendants have responded to this motion by distinguishing *Sendak* on the ground that the statute in that case "referred directly to abortion," while the Michigan statute and rules apply to "all types of surgical procedures."

Although plaintiffs' complaint alleges alternative causes of action, the motion for summary judgment now before the Court is based solely on the claim that the Act and regulations, as applied to surgical facilities which only perform first-trimester abortions, unconstitutionally interfere with the privacy rights of pregnant women as set forth by the Supreme Court in *Roe* and *Doe.* In plaintiffs' view, these cases stand for the proposition that any state regulation applicable to first-trimester abortions is *per se* unconstitutional. At first glance, there is a considerable amount of language in *Roe* and *Doe* that would seem to support this broad contention. Plaintiffs particularly emphasize that portion of Justice Blackmun's opinion for the Court in *Roe* which appears immediately after the Court's conclusion that the State's interest

in the health of the mother only becomes "compelling" at the end of the first trimester of pregnancy:

It follows that, *from and after this point,* a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the *licensing of the facility*; and the like.

410 U.S. at 163, 93 S.Ct. at 732 (emphasis added). The Court went on to hold that:

(a) For the stage prior to approximately the end of the first trimester, the abortion decision *and its effectuation* must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage *subsequent* to approximately the end of *the first trimester,* the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

410 U.S. at 164, 93 S.Ct. at 732 (emphasis added). Moreover, in *Doe* the Court invalidated a Georgia law requiring that all abortions be performed in hospitals accredited by the Joint Commission on Accreditation of Hospitals, although no other form of surgery was subject to such a restriction. That decision was based on the equal protection clause, rather than due process (the Court cited *Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), a classic application of the equal protection clause), but the Court went on to add:

This is not to say that Georgia may not or should not, *from and after* the end of *the*

*first trimester,* adopt standards for licensing all facilities where abortions may be performed so long as those standards are legitimately related to the objective the State seeks to accomplish.

410 U.S. at 194–195, 93 S.Ct. at 749 (emphasis added). In sum, plaintiffs apparently urge that since both "the abortion decision and its effectuation" must be left to the medical judgment of the pregnant woman's attending physician during the first trimester (*Roe,* 410 U.S. at 164, 93 S.Ct. 705, 732), any state-imposed regulation that restricts the operation of an abortion facility in an effort to safeguard the health of pregnant women is *per se* unconstitutional as applied to first-trimester abortions.

Several decisions of lower federal courts are cited in support of this interpretation of *Roe* and *Doe.* See, e. g., *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir., 1974), cert. denied 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); *Word v. Poelker,* 495 F.2d 1349 (8th Cir., 1974); and *Hallmark Clinic v. No. Car. Dept. of Human Resources,* 380 F.Supp. 1153 (E.D.N.C., 1974) (three-judge court). There is an important distinction between those cases and the instant case, however; the Michigan Act and regulations apply in terms to *all* freestanding surgical outpatient facilities, regardless of the types of surgery performed, and refer specifically to abortions in only minor provisions.[1]

■ Defendants' Answer to the instant motion alleges that there are at least eight surgical facilities that have now been licensed under the Act, four of which do not perform abortions and four of which "primarily" perform abortions. In none of the cases cited by plaintiffs has a court declared unconstitutional state health regulations that applied generally to all surgical procedures technically comparable to first trimester abortions, or declared such a regulation invalid as applied to abortions.

There are several indications that the Supreme Court did not intend that *Roe* be

---

**1.** Rule 51, prohibiting FSOFs from performing abortions after the first 14 weeks of pregnancy; Rule 47(5), prescribing special reporting procedures for "pregnancy terminations"; and Rule 33, requiring that counseling be given to patients prior to "pregnancy terminations".

read so broadly as to prohibit the application of such regulations to abortions. First, it is clear that the practice of a pregnant woman's physician may be regulated by the States to protect the woman's health, even though only first trimester abortions are involved.

> The State may define the term "physician" . . . to mean only a physician currently licensed by the State, and may proscribe any abortion by a person who is not a physician as so defined. . . .
>
> If an individual practitioner abuses the privilege of exercising proper medical judgment, the usual remedies, judicial and intra-professional, are available.

*Roe*, 410 U.S. at 165–166, 93 S.Ct. at 733. Since the States may regulate the practice of licensed physicians in matters generally related to patient health, the Michigan Act regulating FSOFs cannot be considered facially unconstitutional as applied to first-trimester abortion facilities simply because it narrows the physician's choice in deciding where an abortion is to be performed. Clearly, state narcotic laws and zoning regulations are fully valid and enforceable even though they prevent a physician from using certain drugs in first-trimester abortions and from operating a first-trimester clinic in a residential area; yet, plaintiffs' broad reading of *Roe* and *Doe* would appear to apply even to such state regulations as these.

Plaintiffs' contention overlooks the Supreme Court's rationale for the distinction between first-trimester abortions and those occurring later in a woman's term:

> With respect to the State's important and legitimate interest in the health of the mother, the "compelling" point, in the light of present medical knowledge, is at approximately the end of the first trimester. This is so because of the now-established medical fact, . . . that until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth.

410 U.S. at 163, 93 S.Ct. at 731. In this passage, the Supreme Court clearly recognized that the State has a "legitimate interest in the health of the mother" even during the first trimester; this interest does not become "compelling", however, until the end of that period, at which point abortions may become more dangerous to the pregnant woman than normal childbirth. The fact that a state interest is not "compelling" during the first trimester would seem to mean only that the State may not impose regulations having the effect of preventing abortions for a class of women during this period. That fact would not, however, preclude the State from enforcing reasonable regulations that apply generally to insure the safety of all surgical procedures, even though first-trimester abortions are included among them; were this not true, the State would be powerless to prevent first-trimester abortions performed under such dangerous conditions as to make them far more hazardous to the woman's health than normal childbirth—thus, vitiating the rationale for the first-trimester dividing line established by *Roe*. As Justice White observed in his dissent from the Supreme Court's summary affirmance in *Sendak*:

> In *Connecticut v. Menillo,* 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152, we sustained a statute which proscribed abortion by a nonphysician saying:
>
>> . . . the insufficiency of the State's interest in maternal health is predicated upon the first trimester abortion's being as safe for the woman as normal childbirth at term, and *that predicate holds true only if the abortion is performed* by medically competent personnel *under conditions insuring maximum safety for the woman.*

At ——, 97 S.Ct. at 477.

That the language of *Roe* and *Doe* applied only to regulations aimed specifically at abortions, rather than to those governing surgical procedures generally, was recognized in some of the lower court opinions cited by plaintiffs, even though the issue was never directly presented. In *Friendship Medical Center,* for example, Circuit Judge Fairchild's concurring opinion quotes the following passage from *Roe* :

The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise.

410 U.S. at 149–150, 93 S.Ct. at 725. Judge Fairchild inferred from this passage that:

special regulation aimed expressly or in fact at abortions, including those conducted during the first trimester, such as in the present case, impermissibly limits the patient's constitutional right to privacy by imposing a burdensome, extra layer of requirements upon a surgical process deemed indistinguishable from similar medical procedures. Nevertheless, regulation of the safety of all these procedures, incidentally including first trimester abortions, through imposition of generally applicable regulations, would seem to be a valid exercise of the State's interest in protecting health and need only satisfy the traditional tests of judicial scrutiny imposed in this area.

505 F.2d at 1155. Circuit Judge Sprecher's majority opinion also indicated that some regulation of abortions is permissible during the first trimester:

any general health regulations which would apply to first trimester abortions would have to be limited so as to give effect to the fundamental rights as established by *Roe* and *Doe*; that is not to be burdensome on a woman's right to decide to abort a pregnancy. By this we mean that in all probability nothing broader than general requirements as to the maintaining of sanitary facilities and general requirements as to meeting minimal building code standards would be permissible.

505 F.2d at 1154.

Finally, it is noteworthy that in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court, in *dicta,* twice indicated that general regulations imposed on all comparable surgical procedures would not be invalid as applied to first-trimester abortions. After upholding a requirement that the patient give written consent prior to an abortion, the Court, in explaining this result, observed that "We could not say that a requirement imposed by the State that a prior written consent for any surgery would be unconstitutional" (sic). At 67, 96 S.Ct. at 2840. Later in the opinion, the Supreme Court considered a Missouri statute requiring records to be kept of all abortions, regardless of the pregnancy stage involved:

Recordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible. This surely is so for the period after the first stage of pregnancy, for then the State may enact *substantive* as well as recordkeeping regulations that are reasonable means of protecting maternal health. As to the first stage, one may argue forcefully, as the appellants do, that the State should not be able to impose any recordkeeping requirements that significantly differ from those imposed with respect to other, and comparable, medical or surgical procedures. We conclude, however, that the provisions of §§ 10 and 11, while perhaps approaching permissible limits, are not constitutionally offensive in themselves. . . . (W)e see no legally significant impact or consequence on the abortion decision or on the physician-patient relationship.

At 80–81, 96 S.Ct. at 2846 (emphasis added). The Supreme Court's distinction between recordkeeping requirements and "substantive" requirements is particularly pertinent to plaintiffs' claim in the motion now before this Court.

Plaintiffs argue, however, that *Sendak* squarely refutes any suggestion that the Supreme Court in *Planned Parenthood v. Danforth, supra,* had signalled a retreat from the no-first-trimester-regulation position explicitly set out in *Roe*

*v. Wade,* . . . (*Sendak*) holds at least that the State may not require first trimester abortions to be performed in "a licensed health facility as defined in I.C. 1971, 16–10–2". . . . As this Court can readily see, the unconstitutional Indiana regulations are of the same nature, subject matter, and scope as those at issue here.

The Court agrees that the Indiana regulations referred to in *Sendak* are very comparable to the Michigan regulations in the instant case. However, those licensing regulations were simply not challenged in *Sendak,* and were certainly not held "unconstitutional". Rather, the three-judge district court in that case considered only one section of an Indiana *abortion statute* making first-trimester abortion a crime unless performed in a hospital or licensed health facility. *Arnold v. Sendak,* 416 F.Supp. 22, 23 (S.D.Ind., 1976). That provision was held unconstitutional, but the statute providing for the licensing of health facilities was unaffected. *Sendak* is clearly distinguishable from the case at bar: Michigan does not prevent physicians from performing first-trimester abortions in their private offices, and the Michigan act and regulations do not single out abortion procedures for special treatment (with minor exceptions; n.1, *supra*). The Michigan legislature has said only that if abortions are to be performed in a freestanding surgical outpatient facility, that facility must meet certain general sanitation and safety standards. Nothing in *Sendak* prevents the State of Indiana from continuing to enforce its similar regulations governing "ambulatory outpatient surgical centers".

██ For the reasons stated above, the Court disagrees with the plaintiffs' contention that the States may not enforce generally applicable health regulations simply because they have an effect on first-trimester abortions.

██ Certain provisions of Michigan's Public Act 274 of 1974, and its concomitant regulations, however, have such a direct and burdensome impact on first-trimester abortions that they cannot constitutionally

be applied to such procedures. One such provision is Rule 28 of the regulations, M.A.C. R325.3828, which provides, as follows:

> The owner or governing body shall adopt and enforce a policy which will require that informed consents will be obtained from a patient or, in case of an unemancipated minor, the responsible relative or guardian prior to the performance of surgical procedures, and shall require that signed written consent forms be placed in each patient's chart.

Insofar as this rule requires the written consent of the *patient,* it is above reproach. *Danforth, supra,* at 65, 96 S.Ct. at 2839. In requiring the consent of the parents of unemancipated minors, however, this rule conflicts with the *Danforth* holding that the States may not impose a blanket provision requiring parental consent as a prerequisite to a first-trimester abortion on an unemancipated minor. At 72–75, 96 S.Ct. at 2842–45. See also, *Poe v. Gerstein,* 517 F.2d 787 (5th Cir., 1975) and *Planned Parenthood Assn. v. Fitzpatrick,* 401 F.Supp. 554 (E.D. Pa., 1975) (three-judge court). While a carefully-drawn rule on parental consent, including a provision for judicial intervention if consent is denied, might well be permissible [cf. *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)], Michigan's Rule 28 effectively permits a "responsible relative or guardian" to veto the performance of an abortion on an unemancipated minor in a freestanding surgical outpatient facility. It is true that a pregnant minor could obtain an abortion in a physician's private office in Michigan without parental consent, and *Danforth* is, therefore, technically distinguishable. Defendants have not contended, however, that there is any special reason to give a minor's parents veto power over abortions to be performed in a freestanding surgical facility. In the absence of such particularized justification, the parental consent requirement is no more valid when limited to abortions in such facilities than it is when applied to all abortions.

The only other provision of the Michigan Act and regulations that appears facially

unconstitutional as applied to first-trimester abortions is § 21 of Public Act 274 of 1974, which states flatly that "A licensed freestanding surgical outpatient facility shall not advertise in any manner its services." In *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), the Supreme Court declared unconstitutional a Virginia statute which made it a misdemeanor to encourage or prompt the processing of an abortion by the sale or circulation of any publication. An editor of the *Virginia Weekly* was prosecuted and convicted for publishing an advertisement placed by a New York abortion referral service (the abortions advertised were legal in New York). The Supreme Court held that the statute as applied to appellant Bigelow unconstitutionally infringed his rights under the First Amendment.

In the instant case, Michigan has a different state interest than Virginia had in *Bigelow* —that of preserving high standards of medical care within the State. Thus, Michigan may arguably engage in reasonable regulation of advertising of abortion services. However, a total ban on advertising by FSOFs does not constitute "reasonable regulation". *Population Services International v. Wilson,* 398 F.Supp. 321 (S.D.N.Y., 1975) (three-judge court). A Pennsylvania statute banning advertising " 'having the purpose of inviting, inducing or attracting members of the public to come to (a) physician, clinic or other person or agency to have abortions or to purchase abortifacients' " was declared unconstitutional on the basis of *Bigelow* in *Planned Parenthood Assn. v. Fitzpatrick,* 401 F.Supp. 554, 576– 578 (E.D.Pa., 1975) (three-judge court). Finally, any doubts as to the applicability of *Bigelow* to the facts of this case were removed by the Supreme Court's summary affirmance of a district court's ruling that a Louisiana statute prohibiting publication of the availability of abortion services is unconstitutional. *Guste v. Weeks,* —— U.S. ——, ——, 97 S.Ct. 778, 50 L.Ed.2d 772 (1977).

Moreover, cases decided after *Bigelow* strongly imply that the ban on advertising by freestanding surgical outpatient facilities violates the First Amendment even as applied to those facilities which perform and wish to advertise only surgical procedures other than abortions. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). *Consumers Union of U.S., Inc. v. American Bar Assn.,* 427 F.Supp. 506 (E.D.Va., Dec. 17, 1976) (three-judge court). In the instant case, defendants have made no effort to justify the ban on advertising in response to plaintiffs' motion for summary judgment. For the reasons previously stated, that provision of the Act must be declared unconstitutional as applied to the advertising of first-trimester abortions. While *Virginia State Board of Pharmacy and Consumers Union, supra,* suggest that this provision is unconstitutional as applied to the advertising of any service provided by a licensed surgical facility, that issue has not been presented to the Court in this case and cannot, therefore, be decided.

Accordingly, plaintiffs' motion for summary judgment declaring Public Act 274 of 1974 and the regulations promulgated thereunder unconstitutional as applied to freestanding surgical outpatient facilities performing only first-trimester abortions is GRANTED as to § 21 of the Act [M.S.A. § 14.1179(91)] and Rule 28 of the regulations (M.A.C. R325.3828); in all other respects, that motion is DENIED.

The Court is of the opinion that this Order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from this Order may materially advance the ultimate termination of this action.