**INDIANA HOSPITAL LICENSING COUNCIL, Appellant-Plaintiff,**

v.

**WOMEN'S PAVILION OF SOUTH BEND, INC., Appellee-Defendant.**

**No. 3–979A247.**

Court of Appeals of Indiana, Fourth District.

May 28, 1981.

**1302**

Linley E. Pearson, Atty. Gen., Michael Schaefer, Asst. Atty. Gen., Indianapolis, for appellant-plaintiff.

Sanford M. Brook, Amaral & Brook, South Bend, Roy Lucas, Lynn I. Miller, Louis R. Stern, Lucas & Miller, Washington, D. C., for appellee-defendant.

MILLER, Judge.

The current action seeks to establish the applicability of pre-existing licensing statutes for outpatient surgical clinics to the Women's Pavilion of South Bend, Inc., a first trimester abortion facility. Since early 1978, the Women's Pavilion has been operating its facility staffed with two physicians, several nurses, and other medical personnel. Two private non-profit hospitals are also located in South Bend, but they both decline to perform elective abortions. Women's Pavilion is therefore the only facility in the city providing such services under clinical conditions and asserts its right to operate without state interference.

On August 28, 1978, the Indiana Hospital Licensing Council (Indiana Licensing) filed a verified complaint for preliminary and permanent injunctions against the Women's Pavilion of South Bend, Inc., (Pavilion) a first trimester abortion facility, alleging the latter was operating without a license as proscribed by a statute requiring the licensing of all "ambulatory outpatient surgical centers" (AOSC). See Ind.Code 16–10–1–7. Pavilion responded by challenging the constitutionality of the proposed application of the statute and the regulations promulgated thereunder as unduly burdensome on the abortion decision in violation of both equal protection and due process.[1] It further argued that a recent repeal of a criminal statutory provision which required the performance of first trimester abortions in a hospital or licensed health facility indicated the legislature did not intend first trimester abortion clinics be required to obtain a license. The repeal was particularly significant since it occurred after that portion of the statute had been declared unconstitutional by a federal district court in *Arnold v. Sendak*, (S.D.Ind.1976) 416 F.Supp. 22, *affirmed without opinion*, 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579. After a hearing on the merits, the trial court issued a memorandum and order denying injunctive re-

---

1. Pavilion's answer also sought dismissal for failure to state a claim upon which relief could be granted which the court denied.

lief.[2] The court commented that although Pavilion appeared to be an ambulatory outpatient surgical center within the meaning of IC 16–10–1–6(b) to the extent that a first trimester abortion is a surgical procedure, attempted regulation of such abortions through application of Indiana's licensing statute would constitute an impermissible degree of state interference prior to the end of the first trimester.[3] The trial court's memorandum decision recognized the constitutional standard established in *Roe v. Wade*, (1973) 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and noted the legislative repeal of that portion of Ind.Code 35–1–58.5–2 (a criminal statute) requiring abortions to be performed in a licensed health facility rendered the licensing requirements inapplicable to facilities which performed only first trimester abortions.[4]

We affirm.

### ISSUES

The State challenges the judgment of the court raising essentially the following issues:

1) Did the legislative repeal of a portion of the Indiana criminal abortion statute requiring abortions to be performed in hospitals or licensed health facilities preclude application of the licensing statute to facilities performing first trimester abortions?

2) Did the trial court err in finding the Indiana statutory scheme for the licensure of the ambulatory outpatient surgical centers would unduly burden the abortion decision if applied to first trimester abortion facilities?

### APPLICABLE STATUTES AND REGULATIONS

Before considering the evidence presented to the trial court, it is appropriate to first consider the statute and regulations constituting the focus of the current dispute. Ind.Code 16–10–1–7 prohibits the establishment or operation of an ambulatory outpatient surgical center without a license. The requirements for obtaining a license are contained in Ind.Code 16–10–1–6(b) which appears to perform a dual function as a definitional and substantive statute:

"(b) The term 'Ambulatory Outpatient Surgical Center', when used in this chapter, shall be construed to mean a public or private institution which:

1. is established, equipped and operated primarily for the purpose of performing surgical procedures and services;

2. is operated under the supervision of a staff of physicians duly licensed in the State of Indiana or the governing board of the hospital in the event it is affiliated with a hospital;

3. permits a surgical procedure to be performed only by a physician or dentist who at the time is legally authorized to perform such procedure and is privileged to perform such procedures in at least one (1) hospital within the county in which the ambulatory outpatient surgical center is located in this state and is admitted to the 'open staff' of the ambulatory outpatient surgical center;

4. requires that in all cases other than those requiring only local infiltration anesthetics, that an anesthesiologist supervise the administration of all the anesthetics to patients, and who must remain present in the facility during the surgical procedure;

5. provides at least two (2) operating rooms and at least one (1) postanesthesia recovery room of sufficient size and sufficient equipment to accommodate five (5) patients on carts at any one (1) time;

6. is equipped to perform diagnostic x-ray and laboratory examinations required in connection with any surgery to be performed;

---

**2.** Not included in the record is Indiana Licensing's application for a temporary restraining order which was denied but not appealed.

**3.** According to the record, separate findings of fact were neither issued by the court nor requested by either party.

**4.** The court also initially denied Pavilion's counterclaim for litigation expenses under 42 U.S.C. § 1988 but later granted the same after a motion to correct errors.

7. does not provide accommodations for patient stays of longer than 24 hours;

8. provides full-time services of duly registered and licensed nurses for the professional care of the patients in the postanesthesia recovery room;

9. has available the necessary equipment and trained personnel to handle foreseeable emergencies (including a defibrillator for cardiac arrest, a tracheotomy set for airway obstructions, and a blood bank or other blood supply);

10. maintains a written agreement with one (1) or more hospitals in close proximity for immediate acceptance of patients who develop complications or require postoperative confinement;

11. provides for the periodic review of the center and its operations by a utilization review or other committee composed of three (3) or more duly licensed physicians having no financial connections with it;

12. maintains adequate medical records for each patient;

13. the facility must meet all additional minimum requirements as established and promulgated by the Indiana state board of health as to building requirements and equipment requirements;

14. the facility must meet such other requirements, rules and regulations as may be established by the Indiana state board of health hereafter in the interest of the health, safety and welfare of those individuals who are furnished services."

According to the state, Pavilion meets the hallmark qualities of an AOSC in that they are a facility performing surgical procedures without providing overnight accommodations for patients.

Also at issue here are the regulations referred to in subsections b(13) and b(14),

*supra,* under which Indiana Licensing with the approval of the State Board of Health has issued a detailed scheme appearing at 410 IAC 15–2–1 *et seq.* (1979 Ed.). In addition to the statutory mandate for facility compliance with all minimal requirements as set out by the State Board of Health, the regulations also provide that "[a]ll centers shall comply with all regulations set forth herein." 410 IAC 15–2–2 (1979 Ed.). *Non-statutory* requirements, however, may be waived for limited practice centers upon a showing of good cause and within the Council's discretion.[5] *Id.*

The applicable regulatory scheme governs the medical, maintenance, structural, administrative and record-keeping aspects of all ambulatory outpatient surgical centers, as highlighted below. *It should be noted, however, that both the statute and regulations are applicable to outpatient surgical centers generally and do not mention abortion procedures specifically.*

Medical provisions included in the regulatory scheme concern guidelines for patient care, performance of surgical procedures by physicians,[6] personnel availability for emergencies, licensed registered nurses in the recovery room, instruction on follow-up care, railings on patient carts, and sterilization of equipment and supplies. Emergency equipment required includes a cardiac monitor and defibrillator, inhalation-resuscitation equipment including oxygen, and a tracheotomy set. Provisions are also made for maintenance of supplies including a linen and laundry service, separation of clean and soiled linen, cleaning of fixtures, walls, floors, and ceilings, and maintenance of the building and grounds including prevention of conditions conducive to the breeding of vermin.

**5.** Pavilion's challenge is directed at statutory as well as regulatory requirements.

Ind.Code 16–10–1–11 provides for appeal to the circuit or superior court by any licensee or applicant for a license "aggrieved by the action of the council." Of course the instant case is not such an administrative review since Pavilion never applied for a license. The Council does not contend Pavilion failed to exhaust administrative remedies, no doubt due in part to the constitutional nature of the subsequent challenge.

**6.** The specific requirement that an *abortion* be performed by a licensed physician is contained in IC 35–1–58.5–2(a)(1), which declares abortions performed by non-physicians a class C felony.

A large portion of the regulations prescribed the structural and environmental requirements for licensed facilities including a surgical suite consisting of two operating rooms (a statutory requirement), doctors' dictation area, scrub-up positions, medicine preparation area, autoclave area (for sterilization), soiled linen holding room, janitor's closet, nurses' dressing room and toilet facilities, doctors' dressing room and toilet facilities, and refrigerated storage for blood. Provision must also be made for separate patient and postanesthesia areas, the latter requiring room to accommodate five patient carts (another statutory requirement) with three feet between each. The regulations also contain extensive design specifications for ceiling and floor finishes, corridor and door widths in areas requiring patient movement by cart, ventilation, illumination, humidity, water supply, plumbing, refuse disposal, and emergency electric service equipment which must include, among other things, on site fuel storage for at least four hours of operation.

In the administrative category, the clinic must, for example, adopt a constitution and by-laws, employ an executive officer with at least five years experience, maintain job descriptions and written policy and procedure manuals, establish infection control and tissue committees, maintain minutes of meetings of the governing authority and committees, and provide records for inspection by Indiana Licensing and the State Board of Health showing compliance with local, state and federal laws and adherence to by-laws and regulations. Additional administrative provisions cover the maintenance and specific content of employment, personnel and patient records, retention of such records for 25 years, and official reporting of services rendered patients.

### EVIDENCE BEFORE THE TRIAL COURT

The essentially uncontested evidence revealed the following. Pavilion is a private for-profit, non-professional Florida corporation duly certified to do business in Indiana. The officers of the corporation, who take part in decisions to purchase equipment, are non-physicians. Pavilion, however, maintains a staff of 14 persons consisting of one doctor of medicine, one doctor of osteopathy, three registered nurses (one of whom is also a family planning nurse practitioner), two licensed practical nurses, two operating room technicians, two laboratory technicians and three counselors. It appears that all personnel required to be licensed by the state are in fact so licensed. Referrals are received from physicians, agencies such as Planned Parenthood, family planning clinics, welfare departments, and family counselors. Pavilion is inspected yearly by Planned Parenthood which has approved the facility under its own set of standards which are in some respect similar to the State's regulations.

Pavilion, housed in a physician's former office, is located across the street from St. Joseph's Hospital and about five minutes away from Memorial Hospital, private not-for-profit hospitals which do not perform elective abortions. The facility contains a reception area, two bathrooms, a laboratory two surgical procedure rooms, two recovery rooms, two counseling rooms, a staff room, and an autoclave room but does not maintain facilities for overnight accommodation since patients stay in the building for only approximately three and one-half to five hours.

Pavilion performs only first trimester abortions using the dilation and aspiration method for which the principal piece of equipment is the Berkeley Aspirator, commonly referred to as a vacuum. Patients receive only local anesthesia *by injection*, described as similar to that received in a dentist's office, which produces numbness in the area of the cervix.[7] Pavilion also main-

---

7. The Pavilion utilizes the procedure outlined in 410 IAC 3.5–1–3 pursuant to IC 35–1–58.5–2 (the criminal statute) requiring an explanation of the procedure used prior to obtaining a patient's consent, and is included here for informational purposes only. When the suction curettage method is used, the explanation requirement is partially met by informing the patient as follows:

tains equipment for pregnancy testing, a hematocrit to screen for anemia, equipment for Rh typing, and an autoclave for sterilization.[8] Two pieces of emergency equipment *required by statute* which the Pavilion does not maintain are a defibrillator for cardiac arrest and a tracheotomy set for airway obstructions, although they do maintain emergency intraveneous fluids and an emergency cart containing various equipment. Pavilion also has an agreement with an ambulance service for transportation of its patients to a local hospital in emergencies.

Various services rendered patients in the recovery room include the monitoring of blood pressure, pulse and bleeding, and the giving of instructions on follow-up care, birth control and medication. Patients are routinely prescribed medication to prevent infection and to control bleeding.

According to the Director of the Hospital and Institutional Services Division of the Indiana State Board of Health, Women's Pavilion is one of approximately nine ambulatory outpatient surgical centers in Indiana, eight of which performed first trimester abortions at the time of the hearing. Only two of the latter centers were licensed, and only one of those licensed per-

formed only first trimester abortions.[9] The testimony therefore indicates all six unlicensed facilities in the state perform only first trimester abortions.

Several expert witnesses presented slightly conflicting testimony regarding the necessity or desirability for compliance with the statute and regulations by first trimester abortion clinics. Indiana Licensing relies principally on the testimony of Dr. Ralph Streeter, a licensed physician and president of the Indianapolis Women's Center, a first trimester abortion clinic licensed by the Council.[10] Pavilion relies primarily on the testimony of Dr. Gordon Cook and Dr. Jane E. Hodgson. Dr. Cook, who performs the abortions at Pavilion, is a licensed physician in Indiana and board certified as a specialist in obstetrics and gynecology since 1948.[11] Dr. Hodgson is currently an Associate Professor of Obstetrics and Gynecology at the University of Minnesota and, in her capacity as Director of the University Fertility Control Clinic, teaches residents in the sub-speciality of fertility control which includes sterilization, abortion, contraception, and infertility. She has also reported several studies on the complications of first trimester abortions.[12]

---

"The lining of the uterus is carefully vacuumed and scraped with a hollow plastic tube which is attached to a longer tube connected to a gentle vacuum machine. This procedure takes about five minutes. For most patients, discomfort is limited to menstrual-like cramping during and for 15–20 minutes after the procedure. Use of a local anesthetic injected into the cervix prior to surgery helps minimize pain."

8. Although Pavilion does not take "cultures" from the autoclave or maintain written records of inspections the testimony indicated the autoclave is periodically inspected and routinely cleaned. There was no testimony indicating these procedures were deficient in any way.

9. The other clinics holding licenses performed various procedures in addition to first trimester abortions, including biopsies, sterilizations, dilation and curettage, plastic surgery and tooth extractions.

10. Dr. Streeter received his medical degree in 1950, maintains a private office in Indianapolis, and was formerly a member of the Board of the National Abortion Federation.

11. Dr. Cook was Chief of the Department of Obstetrics at both St. Joseph Hospital and Memorial Hospital, and served as President of the Staff at St. Joseph Hospital and on the Medical Committee for the Great Lakes Regional Area. In addition to currently maintaining a private office in South Bend and performing abortions at Pavilion, Dr. Cook is the Medical Director of Planned Parenthood of North Central Indiana.

12. Dr. Hogdson is a Founding Fellow of the American College of Obstetrics and Gynecology, member of American Fertility Society, member of the Association for Planned Parenthood Physicians, National Board Member of the National Abortion Federation, member of the Executive Committee of the Association of Planned Parenthood Physicians and on the Medical Advisory Committee of the Minnesota Planned Parenthood Association. She has also served as consultant at a number of first trimester abortion clinics throughout the country including clinics in Boston, Cleveland, Kansas City, Columbia (Missouri), Harrisburg (Pennsylvania), and New York City.

These experts agreed approximately 60 percent of all first trimester abortions performed in 1976 were performed outside hospitals with a *mortality rate* of less than one out of 100,000 patients. Dr. Hodgson explained this figure included the mortality rate in *all* types of abortions whereas in first trimester abortions the latest figure was .8 deaths per 100,000 procedures. Dr. Cook testified the *complication rate* for abortion was approximately 1.5 to 2.5 percent. All experts agreed the complication and mortality rates for first trimester abortions were extremely low.[13]

The risks inherent in first trimester abortions were compared to several other procedures by all physicians testifying. Dr. Hodgson testified a first trimester abortion is safer than a penicillin shot where the risk of reactions resulting in death were at the rate of one or two per 100,000. She also testified the mortality rate for the insertion of I.U.D.s is even greater, and the risks for tonsillectomies is five times as great, at least five per 100,000. On the other hand, Dr. Streeter was of the opinion that the risk

in first trimester abortions is "similar" to the risks in sterilization procedures, tonsillectomies, tooth extractions and repair of lacerations. The experts also agreed physicians perform various forms of minor surgery in their offices without state regulation, such as cauterization of the cervix, biopsies, and even abortions. Notably, Dr. Streeter testified the risk of death from legal abortions in non-hospital facilities is similar to the risk in hospitals, relying for his opinion on Grimes, Cates & Tyler, *Comparative Risk of Death from Legally Induced Abortions in Hospitals and Non-Hospital Facilities*, (1978) 51 OBSTETRICS AND GYNECOLOGY 323.

A relatively large portion of the testimony centered on the necessity for various pieces of equipment and various space restrictions as mandated in both the statute and the regulations. Specifically, IC 16–10–1–6(b)(9) requires a defibrillator and a tracheotomy set as well as a blood supply. Dr. Streeter testified he felt a necessity for a defibrillator since the abortion procedure

---

**13.** The possible complications in first trimester abortions are explained in 410 IAC 3.5–1–3 as follows:

"Complications are rare but include:
(A) Infection of the vagina, uterus, or tubes (about 9 cases per 1000 abortions by this method). Symptoms include severe abdominal pain, fever and possibly a foul vaginal discharge. Antibiotic treatment is required; and
(B) Perforation of the uterus (making a hole in the wall of the womb). This is very rare (occurring in about 3 of each 1000 suction curettage procedures) but a possibility because some women have weak uterine muscles. The instruments the doctor is using may hit a weak spot in the wall of the uterus and break through. Sometimes a perforation will cause internal bleeding which can only be stopped by further surgery; rarely, a hysterectomy (removal of the uterus) may be necessary. Most perforations close themselves without any bleeding problems, however, and will not prevent bearing children later on; and
(C) Missing all or part of the pregnancy. This happens in about 6 of every 1000 abortions by this method. This may be obvious to the doctor at time of surgery or may be determined upon laboratory examination of the tissues removed. Bleeding and/or infection may result. The patient may need a

dilation and curettage procedure (D and C) for removal of remianing [sic] pregnancy tissue. Tubal pregnancy, a rare possibility, would require surgical removal of the tube with the pregnancy; and
(D) Adverse reactions to the local anesthetic, which are reported to occur in 1 or 2 of each 1000 suction curettage procedures. Allergic reactions to the anesthetic produce symptoms ranging from dizziness and blurred vision to convulsions, shock, and possibly even death. Severe complications from the use of local anesthesia are rare."

As explained in footnote 7 *supra*, 410 IAC 3.5–1 *et seq.* outlines the minimal information which must be given an abortion patient in order to comply with the consent procedures, required under IC 35–1–58.5. The regulations were filed in 1979 and were not, of course, introduced as evidence in the case under consideration, nor were they enacted pursuant to the statute under consideration here. We observe, however, a consent requirement was upheld in *Planned Parenthood of Central Missouri v. Danforth*, (1976) 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 based on a finding that the particularly stressful nature of the abortion decision warranted additional state regulation to insure consent was intelligently and freely given, even though no other state statute imposed a similar requirement for other surgical procedures.

entailed the use of injectable solutions and medications, although he admitted fibrillation was a rare occurrence, and in the approximately 14,000 abortion procedures performed at his clinic since 1974 there had never been an occasion to use such equipment.[14] He additionally stated a cardiac monitor, required by the regulations, was "not essential." Noting the abortion patient population was typically comprised of young, healthy women, Dr. Hodgson also testified she had never seen a cardiac arrest or had any occasion to use a defibrillator or cardiac monitor in the context of a first trimester abortion.[15]

All experts agreed several space requirements, including the regulatory provisions for eight foot hallways, amount to wasted space. Regarding the blood supply, both Dr. Streeter and Dr. Hodgson agreed an on-site blood supply was unnecessary and even wasteful since blood lasts only a few days. Significantly, a study cited by Dr. Hodgson showed the necessity of a blood transfusion in only 10 out of 10,000 cases, with only two out of the ten transfusions being administered during the first week, and *none being administered during the first 24 hours*. Dr. Streeter, however, testified the on-site blood requirement was waived by the Licensing Council upon proof of the availability of a blood supply at a nearby hospital.[16] All experts also agreed the requirement for a written transfer agreement between the facility and a local hospital is superfluous, since it appears all physicians with hospital staff privileges are entitled to emergency patient transfer without a written agreement. Finally, according to Dr. Streeter there is no necessity for a back-up electrical generator.[17]

None of the expert witnesses, including Dr. Hodgson who has extensive national experience with first trimester abortion clinics, were aware of any state which requires a special license beyond the licensing of the physicians who performed the abortions. Dr. Hodgson explained the restraints on physicians in their practice of minor surgery, including their concern for their own credentials, licensure, organizational membership, hospital privileges and the threat of malpractice suits, all combined to keep the standards of medicine high and alleviated the need for extra legislation.[18]

Of particular importance is the expert testimony regarding the impact of Indiana's regulatory scheme on the availability of first trimester abortions. Although Dr. Streeter testified the licensing statute did not interfere with a woman's freedom to decide to have an abortion "as far as [his] clinic was concerned," Dr. Hodgson testified the impact of the regulations on the practice and availability of first trimester abortions would be "appalling," forcing most of them "to either raise their fees tremendously so the procedure would not be available or else they would be forced to close." Finally, Dr. Cook, of the Women's Pavilion testified compliance with the space and equipment requirements under the statute would be "economically unfeasible." In contrast we note the lack of any evidence that Pavilion posed a health hazard as an unlicensed facility; in fact Dr. Hodgson testified she was "very impressed" with the Pavilion's facility which compared "extremely well" with other like facilities in the United States.

---

14. Dr. Streeter testified he purchased a defibrillator and cardiac monitor in 1974 for between $4,000 and $5,000, a relatively expensive piece of equipment.

15. It is interesting to note the failure of 410 IAC 3.5–1–3 to mention cardiac arrest as a possible complication. Dr. Hodgson explained the chances of needing a defibrillator were greater with *general* anesthesia as opposed to the local anesthesia used at Pavilion and other first trimester abortion facilities.

16. Indiana Licensing apparently interprets IC 16–10–1–6(b)(9) to only require availability of blood at a nearby facility rather than on-site.

17. Regarding the administrative requirements, on which there was little testimony, the Director of the Hospital and Institutional Services Division expressed the opinion that the 25 year record retention regulation was "outdated."

18. Dr. Streeter also explained that many of the Planned Parenthood standards were as strong or stronger than the state's requirements.

## DECISION

*Issue One: Did the legislative repeal of a portion of the Indiana criminal abortion statute requiring abortions to be performed in hospitals or licensed health facilities preclude application of the licensing statute to facilities performing first trimester abortions?*

It appears from the trial court's memorandum that its decision was partially based on certain legislative action which might indicate the legislature did not intend the application of the licensing statute to first trimester abortion clinics. Specifically, the trial court referred to the legislative repeal of Indiana's criminal abortion statute, IC 35–1–58, which initially required all first trimester abortions to be performed in a hospital or licensed health facility but was amended in 1978 to delete that requirement, italicized below, as follows:

"Abortion shall in all instances be a criminal act except when performed under the following circumstances:

(a) During the first trimester of pregnancy for reasons based upon the professional medical judgment of the pregnant woman's physician provided:

(1) It is performed by such physician *in a hospital, or a licensed health facility as defined in IC 1971, 16–10–2 which offers the basic safeguards as provided by a hospital admission, and has immediate hospital back-up;* .... [Acts 1973, P. L. 322, Sec. 2; *Amended by* Acts 1978, P. L. 143, Sec. 1.]"

The italicized language was deleted after the United States District Court for the Southern District of Indiana held that portion constitutionally infirm. *See Arnold v. Sendak,* (S.D. Ind.1976) 416 F.Supp. 22, aff'd 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579. In *Arnold,* the Court explained its holding as follows:

"The challenged section of the Indiana abortion statute is clearly unconstitutional. The decisions in *Roe* [*v. Wade,* (1973) 410 U.S. 113, (93 S.Ct. 705, 35 L.Ed.2d 147)] and *Doe* [*v. Bolton,* (1973) 410 U.S. 179, (93 S.Ct. 739, 35 L.Ed.2d 201)] expressly state that *regulation by the state*

*as to the facility in which an abortion is to be performed is the type of regulation which can only occur after the 'compelling point' or the end of the first trimester."* (Emphasis added.)

*Id.* at 23–24. The United States Supreme Court summarily affirmed the District Court's decision in *Arnold.* The trial court's memorandum viewed the legislative amendment as a recognition of the *Roe* standard pertaining to first trimester abortions, and concluded the type of facility in which the procedure is performed is not subject to licensing under IC 16–10–1–7, the statute in question.

Indiana Licensing argues *Arnold v. Sendak, supra* does not stand for the proposition that a first trimester abortion can not be required to be performed in a licensed outpatient facility, but only that the state may not require the performance of an abortion in a "hospital" or a "health facility licensed under 16–10–2," the latter being a facility providing care beyond a 24-hour period. Indiana Licensing, however, fails to perceive the definition of a "hospital" as provided for in Ind.Code 35–1–58.5–1(c) as follows:

"(c) The term "hospital" terms:

(1) A hospital as defined in IC 1971, 16–10–1–6 as amended, which is required to be licensed by the state board of health as provided in IC 1971, 16–10–1, or which is operated by an agency of the United States; or

(2) *An ambulatory out-patient surgical center as defined in IC 1971, 16–10–1–6(b)."* (Acts 1973, P.L. 322, Sec. 2.)

It therefore appears the Indiana Legislature's deletion of that portion of the statute providing for the performance of an abortion in a hospital effectively deleted the requirement that an abortion be performed in an ambulatory out-patient surgical center since "hospital" is defined as including ambulatory out-patient surgical centers.

Neither party addresses this definitional aspect of the legislative amendment. Rather, Indiana Licensing points out that IC 35–1–58.5–2 is a criminal statute and if

construed in *pari materia* with IC 16–10–1–6, "it is more reasonable to conclude that the general assembly intended to continue in place any requirements that *do* pass constitutional tests, including pre-existing general health requirements," (emphasis in original) on first trimester abortion facilities. This argument would necessitate an examination of the constitutional ramifications of applying IC 16–10–1–6 to first trimester abortion clinics, since under a fundamental rule of statutory construction if a statute is susceptible of more than one interpretation the Court may consider the consequences of a particular construction. *See, e. g., Boles v. State,* (1973) 259 Ind. 661, 291 N.E.2d 357. Because we ultimately conclude the trial court was correct in finding application of IC 16–10–1–6 to abortion facilities would constitute an impermissible degree of state interference with the abortion decision we need not determine the effect of IC 38–1–58.5–2's partial repeal on the applicability of the licensing statute.

*Issue Two: Did the trial court err in finding the Indiana statutory scheme for the licensure of the ambulatory out-patient surgical centers would unduly burden the abortion decision if applied to first trimester abortion facilities?*

A threshold issue in this case is the degree to which a state may regulate the abortion decision, if at all, during the first trimester. In the seminal case of *Roe v. Wade,* (1973) 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, the United States Supreme Court struck down as unconstitutional a Texas statute which made it a crime to procure or attempt an abortion except to save the life of the mother. This holding was based on finding that the fundamental right of privacy was "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153, 93 S.Ct. at 727. *Roe* therefore established a woman's fundamental right to an abortion based on the right of privacy aspect of the Fourteenth Amendment's due process clause.

Consequently, under due process analysis, the state must show a compelling reason for regulations which burden the abortion decision:

"Where certain 'fundamental rights' are involved, the Court has held that *regulation limiting these rights may be justified only by a 'compelling state interest,'* (citations omitted) *and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake.* (Citations omitted.)" (Emphasis added.)

*Id.* at 155, 93 S.Ct. at 728. In applying this standard the Court formulated the now familiar trimester test based on the conclusion that this right was not absolute, but was subject at some point to the state's interests in protecting maternal health. Prior to the end of the first trimester governmental concern for maternal health was not sufficient to overcome the woman's right to make an abortion decision:

"With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point in the light of present medical knowledge, is at approximately the end of the first trimester. This is so because of the now-established medical fact, . . . that *until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth. It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.* Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.

*This means, on the other hand, that, for the period of pregnancy prior to this 'compelling' point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment,*

*the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State."* (Emphasis added.)

*Id.* at 163, 93 S.Ct. at 731. In finding Texas's criminal abortion statute violative of the due process clause of the Fourteenth Amendment, the Court summarized its decision as follows:

"(a) *For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.*

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it choses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." (Emphasis added.) [19]

*Id.* at 164–65, 93 S.Ct. at 732.

█ State regulations burdening the abortion decision have also been invalidated as a denial of equal protection. In *Doe v. Bolton,* (1973) 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, the companion case to *Roe,* the Supreme Court held invalid a provision of a Georgia abortion statute restricting the performance of abortions to hospitals accredit-

ed by a private organization. The requirement was not based on differences reasonably related to the purposes of the act in which it was found, since Georgia had no similar restriction on the performance of non-abortion surgeries in hospitals not so accredited. The Court concluded:

"This is not to say that Georgia may not or should not, *from and after the end of the first trimester,* adopt standards for licensing all facilities where abortions may be performed so long as those standards are legitimately related to the objective the state seeks to accomplish." (Emphasis added.)

*Id.* at 194–95, 93 S.Ct. at 749. *Roe* and *Doe* clearly posit the abortion decision as a fundamental right which is subject to state regulation during the first trimester only upon a showing of a compelling state interest.

We are therefore confronted with determining whether the proposed application of the statute and regulations affect the fundamental abortion decision and whether this interference is sufficiently balanced by a compelling state interest in the instant case. The State only briefly disputes whether regulations regarding the personnel and facilities required for abortions impinge upon the fundamental "abortion decision." This question was addressed in *Friendship Medical Center, Ltd. v. Chicago Bd. of Health,* (7th Cir. 1974) 505 F.2d 1141, 1151, *cert. denied* (1975) 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 where the Seventh Circuit Court of Appeals held the regulation of these factors by their very nature restricted the abortion decision and affected whether and in what manner the abortion

**19.** On the other hand, Indiana Licensing appears to rely on another passage in *Roe* to support the state's application of general regulations to all abortions. They have failed, however, to quote or discuss the Court's concluding remarks contained in the same passage and emphasized below, which clearly limits the language to abortions during the later trimesters:

"The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the

facilities involved, to the availability of aftercare, and to adequate provision for any complication or emergency that might arise. The prevalence of high mortality rates at illegal 'abortion mills' strengthens, rather than weakens, the State's interest in regulating the conditions under which abortions are performed. *Moreover the risk to the woman increases as her pregnancy continues. Thus, the State retains a definite interest in protecting the woman's own health and safety when an abortion is proposed at a late stage of pregnancy.*" (Emphasis added.)

*Id.* at 150, 93 S.Ct. at 725.

would take place: "The decision whether or not to abort a pregnancy cannot be made in a vacuum without regard to who will perform the operation, where and under what conditions it will be performed, and what procedure will be followed. All these are involved in any abortion decision...." *Friendship, supra* at 1151. Similarly, in *Mahoning Women's Center v. Hunter,* (6th Cir. 1979) 610 F.2d 456, a city ordinance imposing medical and building code regulations on first trimester clinics was viewed as "remov[ing] the effective enjoyment of [the right to choose a first trimester abortion] by imposing heavy and unnecessary conditions on the performance of the operation." *Id.* at 460.

*Mahoning* was decided after recent United States Supreme Court cases distinguishing between impermissible direct state burdens on the abortion decision and permissible state encouragement of an alternative activity. *Maher v. Roe,* (1977) 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484, distinguished a Connecticut regulation, prohibiting the funding of elective abortions but allowing state subsidy of childbirth, from the protection afforded in *Roe* by noting the former regulation "imposed no restriction on access to abortions that was not already there." *Id.* at 474, 97 S.Ct. at 2383. The Court cautioned that its holding in no way signaled a retreat from *Roe* and its progeny, but only recognized:

"a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy. Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader." (Footnote omitted.)

*Id.* at 475–76, 97 S.Ct. at 2383. *Maher* simply recognized a state's limited power to exercise a policy preference for normal childbirth over elective abortions through the allocation of public funds. *See Poelker v. Doe,* (1977) 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528; *Beal v. Doe,* (1977) 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464.

██ In a very recent analogous case, *Harris v. McRae,* (1980) 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784, the Supreme Court utilized a similar distinction to uphold the Hyde Amendment, which severely limited the use of federal medicaid funds to reimburse the cost of even medically necessary abortions. In the majority opinion which concluded the right recognized in *Roe* did not obligate the state to fund abortions, Justice Stewart explained:

"*although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. . . . the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all. We are thus not persuaded that the Hyde Amendment impinges on the constitutionally protected freedom of choice recognized in [Roe v.] Wade.*" (Emphasis added.) (Footnote omitted.)

*Id.,* 100 S.Ct. at 2688. Although a state may not impose unwarranted regulations directly interfering with access to abortions, it is not obliged to utilize its legislative power to remove pre-existing non-governmental restrictions on a woman's access to abortions. Under *Harris* and *Maher, supra,* this latter form of action is properly a subject for legislative policy-making.

Admittedly, we find the dissents in *Harris* registered by Justices Brennan, Marshall, Blackmun and Stevens compelling. *Id.* at 2704–06. As recognized by those Justices, the Hyde Amendment was a brutally "deliberate" and "transparent" attempt to discourage the exercise of a funda-

mental right: "The fundamental flaw in the Court's due process analysis, then, is its failure to acknowledge that the discriminatory distribution of the benefits of governmental largesse can discourage the exercise of fundamental liberties just as effectively as can an outright denial of those rights through criminal and regulatory sanctions." *Id.* at 2704 (Brennan, J., dissenting). Although we consequently believe the majority opinion in *Harris* might be construed as distorting due process analysis in its restrictive definition of the "abortion decision," the Court's definition as articulated does not encompass the case at bar. Here, neither the regulations or statute nor their application to first trimester clinics appear to be motivated by a similar legislative policy, evident in *Harris*, to encourage childbirth rather than abortions. For example, an affidavit by Janet Craig, R.N., Director of Institutional Services, states they are "not opposed to the operation of abortion clinics, but only the operation of unlicensed surgical centers." The state's argument is centered only on an alleged desire to protect the health and welfare of its citizens and is clearly not based on the implementation of a legislative policy to promote childbirth.

In any event, even given a salient manifestation of such a legislative policy, the statute and regulations at issue *directly* impose an obstacle in the woman's path to an abortion. We see little room for a logical distinction between the statute in *Roe* declaring abortions illegal and the statute and regulations here *directly* rendering abortions logistically unfeasible. Here, the hurdle obstructing a woman's access to a first trimester abortion is not a preexisting one but is a direct product of governmental interference.

The only remaining question is whether this degree of state interference is counterbalanced by a compelling state interest. Citing *Roe* and *Doe* for support, several courts, utilizing both due process and equal protection analysis, have concluded that failure to exclude first trimester abortions from the purview of state abortion regulations is an overbroad and unreasonable infringement upon a woman's fundamental right to the abortion decision. For example, in *Friendship, supra*, the Seventh Circuit Court of Appeals struck down regulations promulgated by the Chicago Board of Health which detailed the conditions, equipment and procedures for medical facilities offering abortions without regard to the trimester of pregnancy involved. The regulations there at issue were somewhat similar to the regulations involved in the instant case, providing for record keeping, equipment necessary to treat for hemorrhage, shock, cardiac arrest, and other emergencies, a written affiliation agreement with a licensed Chicago hospital, and the performance of various laboratory tests. Under traditional analysis, the court noted regulations need only bear some rational relationship to a legitimate governmental interest, but where fundamental rights were involved those regulations could be sustained only by a compelling state interest. *Id.* at 1150. Premising their decision on the fundamental right to be free from governmental regulation affecting the abortion decision during the first trimester, the Court concluded the Chicago regulations were constitutionally infirm.

Two United States Supreme Court decisions, rendered after *Friendship*, could be construed as modifications of the seemingly absolute prohibition against state interference during the first trimester under *Roe* and *Doe*. One such case is *Connecticut v. Menillo*, (1975) 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152, where the Supreme Court upheld a statute prohibiting an abortion by a non-physician. The Court explained Roe sought to have an abortion "performed by a competent, licensed physician, under safe, clinical conditions," and limited *Roe* to a recognition of the right to an abortion only under those circumstances. The Court further explained that this limitation was necessary in view of the rationale behind the *Roe* decision:

> "the insufficiency of the State's interest in maternal health is predicated upon the first trimester abortion's being as safe for the woman as normal childbirth at term,

and that predicate holds true only if the abortion is performed by medically competent personnel under conditions ensuring maximum safety for the woman." *Id.* at 11, 96 S.Ct. at 171. Although the *Connecticut v. Menillo* decision contains language indicating a state may require performance of abortions under "clinical conditions," it is interesting to again note the Supreme Court's summary affirmance of the Indiana District Court's decision in *Arnold v. Sendak, supra,* which declared unconstitutional a portion of Indiana's abortion statute requiring all abortions be performed in a hospital or licensed health facility, formulating its decision by interpreting *Roe* as prohibiting *any* regulation of abortion facilities prior to the end of the first trimester. *Arnold v. Sendak,* 416 F.Supp. at 24.

The second Supreme Court decision providing some support for a state's regulation of abortion during the first trimester is *Planned Parenthood of Central Missouri v. Danforth,* (1976) 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788. In *Danforth,* the Court upheld the constitutionality of reporting and, of particular concern here, record keeping requirements as "reasonably directed to the preservation of maternal health." *Id.* at 80, 96 S.Ct. at 2846. The Court distinguished record keeping regulations that were reasonable means of protecting maternal health from substantive regulations which the state could enact only after the first trimester, but cautioned that a state could not accomplish, through the "sheer burden of record keeping detail,"

what would otherwise be an unconstitutional restriction. *Id.* at 80–81, 96 S.Ct. at 2847.

The United States Supreme Court has therefore upheld the right of the state to require that a physician perform an abortion even during the first trimester, and that records be maintained regarding all pregnancy terminations.[20] To this extent, we must agree with Indiana Licensing's assertion that some state regulation of abortions during the first trimester may be permissible if supported by a compelling state interest.

We cannot agree, however, with their broad proposition that the statute and regulations in question presumptively withstand constitutional scrutiny inasmuch as they are "abortion neutral." More specifically, Indiana Licensing attempts to distinguish a broad spectrum of later cases declaring the constitutional infirmity of state abortion regulations by emphasizing the abortion specific nature of the regulations scrutinized in those decisions.[21] Those cases, however, were particularly concerned with that aspect since the regulations were uniformly attacked on *equal protection* grounds. When regulations are abortion neutral, i. e. they do not facially single out abortion for stricter regulation than accorded other surgical procedures involving a similar or greater degree of risk, the regulations may at least superficially survive equal protection scrutiny. That fact alone, however, is not necessarily dispositive of Pavilion's equal protection argument, and has little bearing on their due process challenge.

**20.** *See also West Side Women's Services, Inc. v. Cleveland,* (N.D.Ohio 1978) 450 F.Supp. 796, *aff'd mem.* (6th Cir.) 582 F.2d 1281, *cert. denied,* 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (ordinance banning abortion clinics in retail areas of the city did not unduly burden either the abortion decision or the physician-patient relationship since access to abortion facilities remained in other areas of the city).

**21.** *See, e. g., Word v. Poelker,* (8th Cir. 1974) 495 F.2d 1349 (a city ordinance regulating abortion clinics constituted an impermissible "extra layer of regulation" since no other medical procedure was similarly regulated at the peril of criminal sanctions); *Mobile Women's*

*Medical Clinic, Inc. v. Bd. of Comm'rs of Mobile,* (S.D.Ala.1977) 426 F.Supp. 331 (an ordinance regulating abortion facilities and physicians performing abortions, while not regulating similar medical procedures, deprived the physicians of equal protection); *Hallmark Clinic v. North Carolina Dep't of Human Resources,* (E.D.N.C.1974) 380 F.Supp. 1153 *aff'd per curiam,* (4th Cir. 1975) 519 F.2d 1315 (*if* the state may regulate first trimester abortions, it may do so only to the same extent it regulates other medical procedures). *See also Mahoning Women's Center v. Hunter, supra. Women's Medical Center of Providence, Inc. v. Cannon,* (D.R.I.1978) 463 F.Supp. 531.

Although we recognize the regulatory scheme in the instant case appears to be abortion neutral, the testimony clearly indicates Indiana does not regulate the performance of similarly minor procedures in physicians' offices. Indiana Licensing has not proposed any justification for this distinction, and in fact acknowledges a physician may perform an abortion, as well as other minor surgical procedures, within the confines of his or her office without state intervention or supervision. Nor does the record suggest they could not provide the service in a private home. This factor alone may signal an impermissibly different treatment of two similarly situated classes unjustified by the state's interest in protecting the health of its citizens. *See, e. g., Mobile Women's Medical Clinic, Inc. v. Board of Comm'rs of Mobile*, (S.D.Ala.1977) 426 F.Supp. 331, 333 (impermissible for Mobile to regulate first trimester abortion facilities since a physician or licensed midwife could deliver a child *anywhere* regardless of the relatively higher mortality rate associated with childbirth). Secondly, as we noted earlier the evidence indicates the proposed application of Indiana's allegedly neutral regulations would have an exceedingly disproportionate impact on first trimester abortions, in that all but one of the state's nine out-patient surgical centers perform first trimester abortions, seven of which perform them exclusively. Although the statute and regulations do not facially single out abortions for "extra regulation," the proposed application does appear to have that effect in Indiana.

 In any event, even assuming, *arguendo*, the scheme's validity under equal protection analysis, such a holding does not preclude due process analysis. Abortion neutral regulations may survive a facial equal protection attack, but under due process analysis a state must nevertheless provide compelling reasons for *any* regulation of a fundamental right. Those statutes surviving equal protection attack are not necessarily in accordance with due process. This conclusion was emphasized by a later portion of *Friendship, supra*:

"*any* proposed regulation, *even if applied universally to all similar medical procedures*, because of the fundamental right of a woman to procure an abortion during the first trimester, *would have to meet a compelling governmental interest requirement.* Thus, any general health regulations which would apply to first trimester abortions would have to be limited so as to give effect to the fundamental rights as established by *Roe* and *Doe*; that is[,] not be burdensome on a woman's right to decide to abort a pregnancy. *By this we mean that in all probability nothing broader than general requirements as to the maintaining of sanitary facilities and general requirements as to meeting minimal building code standards would be permissible.*

We do not, however, completely rule out the possibility that there exists some inherent aspects of an abortion procedure which make it unique from other medical procedures of substantially the same risk. For such aspects, the Board of Health may be able to show that a *narrowly drawn* health regulation is compelling. Again we should point out that the state will bear a heavy burden in justifying any such regulation, both with respect to showing the existence of a unique medical complication and with respect to showing that the problem is of such a nature as to be beyond the general scope of a doctor's professional judgment." (Emphasis added.)

*Id.* at 1153–54. Thus, it appears whether the regulations are attacked on equal protection *or* due process grounds, where a fundamental right is involved the state must nevertheless show a compelling countervailing interest as justification for imposition of specific regulations. The remaining discussion will therefore be confined to those cases examining facially neutral abortion regulations under due process analysis.

 It is important at this juncture to emphasize the burden is on the state agency to demonstrate the existence of a compelling state interest supporting the statute and regulations, and to show the scheme is

narrowly drawn to express *only* these interests. *E. g., Roe.* Furthermore, under due process analysis it is well settled that a law which impinges upon a constitutionally protected right is "presumptively unconstitutional." *Harris v. McRae, supra,* 100 S.Ct. at 2685.

There are several recent decisions utilizing due process analysis to examine facially neutral abortion regulations. Only one such decision appears to support the state's contentions in the instant case, and is, in fact, distinguishable. *Abortion Coalition of Michigan, Inc. v. Michigan Department of Public Health,* (E.D.Mich.1977) 426 F.Supp. 471 held every state regulation was not *per se* unconstitutional as applied to first trimester abortions. In support of its conclusion that some regulation was permissible during the first trimester, the Court partially relied on the following observation from *Friendship, supra:*

> "any general health regulations which would apply to first trimester abortions would have to be limited so as to give effect to the fundamental rights as established by *Roe* and *Doe*; that is[,] not be burdensome on a woman's right to decide to abort a pregnancy. *By this we mean that in all probability nothing broader than general requirements as to the maintaining of sanitary facilities and general requirements as to meeting minimal building code standards would be permissible.*" (Emphasis added.)

505 F.2d at 1154. Significantly, this support for general requirements did not prevent the Court in *Abortion Coalition* from declaring several abortion neutral provisions unconstitutional as applied to first trimester abortions, in view of their "direct and burdensome impact" on such procedures.[22] In summary, *Abortion Coalition* clearly stands for the proposition that even regulations which are abortion neutral may not unduly burden the abortion decision.

Several other cases, alluded to earlier, contain a similar message. In *Hodgson v.*

*Lawson* (8th Cir. 1976) 542 F.2d 1350, a pregnant woman and several physicians challenged the constitutionality of a statute and regulations which were initially abortion specific. During the course of litigation the Court was informed the State was in the process of drafting superseding regulations applicable to all "free standing outpatient surgical centers," and remanded the case in order to give the parties an opportunity to present evidence respecting the extent to which the abortion regulations were consistent with those proposed regulations generally applicable to surgical centers. Similarly, in *Baird v. Department of Public Health of the Commonwealth of Massachusetts,* (1st Cir. 1979) 599 F.2d 1098, the Court addressed the constitutionality of a clinic licensure statute which was on its face "abortion neutral." The Court concluded a state may apply the same licensing standards to abortion facilities as they apply to facilities performing similar medical procedures as long as those regulations did not impinge on a woman's right to elect and obtain an abortion during the first trimester. The Court logically held a licensing requirement applicable to all outpatient surgical facilities was not unconstitutional per se, but limited its decision by indicating the lack of evidence regarding whether compliance with the licensure provision would unduly burden the abortion decision. This significant issue was left for future consideration upon the proper presentation of expert testimony:

> "No facts were disputed, and no evidence was introduced as to the impact of these regulations on the ability of the facility to carry out its mission. Specifically, there was no evidence as to . . . whether compliance with the licensure provisions would be so burdensome as to effect the availability of abortions, *as by requiring the clinic to close or to raise its charges significantly. Nor was there any evidence as to whether the provisions were reasonable health regulations.*" (Emphasis added.)

---

22. The neutral provisions declared unconstitutional because of their impact on the abortion decision required parental consent for unemancipated minors and prohibited outpatient clinics from engaging in any form of advertising.

*Id.* at 1100.[23] Indiana Licensing's reliance on *Hodgson,* and *Baird* therefore appears misplaced since in the instant case the question is not whether the statute and regulations are unconstitutional per se but whether the expert testimony supports the trial court's determination that the statute and regulations involved are neither supported by a compelling state interest nor narrowly drawn to reflect only those interests when applied to first trimester abortions.

The result we reach here is similar to the result in the recent case of *Florida Women's Medical Clinic, Inc. v. Smith,* (S.D.Fla.1979) 478 F.Supp. 233, *appeal dismissed,* 5 Cir., 620 F.2d 297, where the Florida court upheld a statutory requirement for licensing of abortion facilities but refused to allow the application of specific regulations directed at those facilities. The regulations invalidated in that case were very similar to the regulations and portions of the statute at issue in the present case in requiring maintenance of various pieces of emergency equipment and specific laboratory services and facilities.[24] The Court based its decision solely on the failure of the state to carry its burden of identifying a compelling state interest warranting the regulations.[25]

■ The evidence in the instant case clearly indicates the total lack of necessity for application of the current statute and regulations to first trimester abortions. The state's own witnesses denied any necessity for various pieces of equipment including a defibrillator, cardiac monitor, blood supply and an emergency electrical generator. Several of the space and structural requirements and the requirement of a written transfer agreement were unequivocally pronounced superfluous, and the 25 year record retention requirement was declared "outdated." This latter requirement deserves particular suspicion since under *Planned Parenthood of Central Missouri v. Danforth, supra,* a mere seven year record-retention provision was viewed as "approaching impermissible [constitutional] limits." 428 U.S. at 81, 96 S.Ct. at 2846.[26]

23. Indiana Licensing points out the trial court's partial reliance on an unpublished memorandum decision by the District Court of Massachusetts in *Baird v. Dep't of Pub. Health,* (D.Mass. Oct. 5, 1978) No. 73–3869–MA, which prohibited regulation of first trimester abortions in any form. Although the District Court decision was reversed, we find such reliance by the trial court was harmless since the reversal only required evidence of the burdensome nature of neutral regulations before justifying a court's invalidation of the scheme:

"When confronting broadly-based, facially neutral regulations of this type, a lay tribunal lacks both the knowledge and expertise to evaluate the question of burdensomeness on its own; evidence, including expert evidence would be essential for this purpose. In the absence of such evidence, we can only assume that the regulations reflect a proper and, in the case of abortions, non-excessive, exercise of the state's power to safeguard the general health, safety and welfare."

*Baird,* 599 F.2d at 1102. As discussed *supra,* in the case at bar there was ample expert testimony to supply the trial court with the knowledge necessary for evaluation of the neutral regulations.

24. The Florida Licensing statute was abortion specific, but contained the following provision rendering it virtually abortion neutral: "[The administrative rules] shall be comparable to rules which apply to all surgical procedures requiring approximately the same degree of skill and care as the performance of first trimester abortions." Fla.Stat. § 390.012 (1978 Supp.) It appears the regulations were not in fact substantially different than regulations applicable to other similar surgical procedures since no equal protection argument was advanced.

25. Cf. *Westchester Women's Health Organization, Inc. v. Whalen,* (S.D.N.Y.1979), 475 F.Supp. 734 where the court upheld regulations providing for five foot corridors, procedure rooms with a minimum dimension of 12 ft. by 15 ft., scrub up facilities, dressing rooms, separate toilet facilities, recovery room sufficient to accommodate two beds and storage space. In that case there was testimony indicating that the regulations coincided with the amount of space necessary to accommodate the equipment involved and the maintenance of aseptic conditions. *Westchester* therefore differs significantly from the instant case since we are confronted with testimony indicating that the regulations are neither reasonable nor compelling with regard to first trimester abortions.

26. Although not explicitly raised by the parties, we note the apparent lack of any statute or regulation protecting the identity of an abortion patient under the reporting and record keeping requirements. A similar omission was viewed as a serious defect in *Mobile Women's Medical*

In short, we cannot conclude a compelling state interest supports the statute and regulations at issue when the state has introduced absolutely nothing to support that proposition.

More importantly, testimony indicated that compliance with these requirements by first trimester abortion facilities would be economically unfeasible and would force the clinic to either raise its fees substantially or close down. Although we recognize the State's interest in protecting maternal health, the statute and regulations are not narrowly drawn to reflect those interests. This conclusion is virtually inevitable. The fact that the statute was promulgated and the regulations were authorized a year before the United States Supreme Court decision in *Roe* and *Doe*, emphasizes the impropriety of its application to first trimester abortion clinics. The statute was not drafted in the narrow manner necessary to protect the fundamental rights at stake here, no doubt because its application to such rights was never contemplated by our legislature. It therefore appears that although a state may require the licensing of a clinic which performs first trimester abortions we must agree with the Court in *Friendship, supra* that such licensing requirements may be conditioned only on compliance with general regulations regarding the maintenance of sanitary facilities, building code standards and the like, unless the State can

*Clinic, Inc. v. Bd. of Comm'rs of Mobile, supra,* at 335–36. *See Planned Parenthood of Central Missouri v. Danforth, supra,* 428 U.S. at 79–81, 96 S.Ct. at 2845–2847.

We feel compelled to briefly comment on the propriety of other portions of IC 16–10–1–6(b) which the parties have not specifically addressed on appeal. Under subsection b(3), *supra,* an AOSC is required to permit:

"a surgical procedure to be performed *only* by a physician or dentist who at the time is legally authorized to perform such procedure and is privileged to perform such procedures in at least one (1) hospital within the county in which the ambulatory outpatient surgical center is located in this state and is admitted to the 'open staff' of the ambulatory outpatient surgical center." (Emphasis added.)

This portion of the statute could produce several anomalous and perhaps unconstitutional results.

First, an AOSC simply could not be established in any of our several counties which do not contain hospital facilities, even though a hospital might be in close proximity but over the county line. We cannot envision any rational basis for such a distinction. Secondly, we note IC 16–10–3–1 provides: "No private or denominational hospital shall be required to permit its facilities to be utilized for the performance of abortions." Consequently, if the only hospital in the county was a private one which elected to exclude the abortion procedure, then it appears an AOSC could not be located in that county since no physician would be "legally authorized" to perform "such procedure" in that hospital. Thirdly, even duly licensed physicians, admitted to a hospital staff in the county but excluded from performing surgery under the hospital's regulations, could not establish an AOSC since they are not authorized to perform "such procedures" in that hospital. And finally, our research reveals statutes and case law supporting the refusal, by at least public hospitals, to admit a licensed physician to its staff "for a variety of reasons relating to *his* professional competence." *Porter Memorial Hospital v. Harvey,* (1972) 151 Ind.App. 299, 308, 279 N.E.2d 583, 589; IC 16–12–23–1; IC 16–12.1–5–1. Therefore, a physician who is not a member of a hospital staff, either by choice or for any other reason, would also automatically be precluded from establishing an AOSC in that county.

We note the lack of any rational basis for any of these results, in part because they exclude physicians who are admitted to the staff, surgical or otherwise, of a nearby hospital located over the county line. Secondly, we believe the state has improperly delegated the power to proscribe abortions in that county, and to determine which physicians may perform abortions in that county, to non-governmental entities without providing guidelines to safeguard against arbitrary conduct. A state "does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy . . . ." *Planned Parenthood of Central Missouri v. Danforth, supra,* 428 U.S. at 74, 96 S.Ct. at 2843.

An analogous deficiency is evident in subsection b(10) which requires the maintenance of a written agreement with hospitals for the transfer of emergency cases. In *Hallmark Clinic v. North Carolina Dept. of Human Resources,* (E.D.N.C.1974) 380 F.Supp. 1153, a similar requirement was found to give hospitals an arbitrary veto power over abortions since the state had placed no limits on a hospital's decision to grant or deny such an agreement. The Court held that due process could not tolerate a licensing system conditioned on official whim. We believe the validity of the indicated subsections are similarly suspect.

demonstrate a compelling interest in other regulations.

*Summary*

The cases reviewed *supra* indicate states have repeatedly attempted to encroach the constitutional boundaries of *Roe, Doe* and their progeny. This is no doubt due, at least in substantial part, to the subject-matter's singular capacity to elicit fervent emotional, legal and scientific debate. Nevertheless, those cases, rendered by our highest Court and based on elemental constitutional principles, retain their legal vitality. Legislative schemes regulating first trimester abortions to the extent involved here have been uniformly declared infirm on equal protection and/or due process grounds. The resulting mandate is clear.

In the instant case, considering the inescapable import of the evidence before the trial court, we have no doubt the highly detailed statute and regulations burden the abortion decision to an extent unjustified by any demonstrable state interest. Given the simplicity and safety of the first trimester abortion procedure and in view of the conspicuous absence of any demonstrated reason for the imposition of the vast majority of the licensing requirements on first trimester abortion facilities, we have no choice but to conclude the state has unequivocally failed to carry its burden. The state's own witnesses candidly acknowledged the needless nature of several requirements, and there appears to be no rationale for singling out abortion facilities for regulation when the state concedes similar procedures as well as abortions can be routinely and safely performed in a physician's office. We acknowledge, without hesitation, the state has a valid interest in promoting maternal health, but the statute and regulations forming the subject-matter of the current controversy clearly do not reflect the narrow legislative drafting necessary to protect the fundamental right at stake here. Application of these requirements to facilities exclusively performing first trimester abortions would only serve to unduly burden the abortion decision
without affording a corresponding degree of protection for maternal health.

Affirmed.

YOUNG, P. J., and CHIPMAN, J., concur.